[Civ. Nos. 19612-19613.  Second Dist., Div. Two.  May 28, 1954.]

BASIN OIL CO., Respondent, v. BAASH-ROSS TOOL COMPANY (a Corporation), Appellant.

Eugene S. Ives for Appellant.

Chandler, Wright, Tyler & Ward for Respondent.

FOX, J.—Defendant appeals from two judgments for damages (rendered in separate actions consolidated for trial), resulting from sales of defective suspension plugs to plaintiff. Plaintiff's complaints comprised counts based on breach of express and implied warranties and negligence in the design and manufacture of such plugs. Defendant pleaded as affirmative defenses contributory negligence, plaintiff's failure to mitigate damages, and a limitation of liability clause in its invoices which precluded the recovery of damages.

Plaintiff Basin Oil Company of California (hereinafter referred to as Basin) is a corporation engaged in the produc-

tion of oil. Defendant Baash-Ross Tool Company (subsequently denominated Baash-Ross) is a designer and manufacturer of tools used in the petroleum industry. In 1946 Basin commenced drilling 16 oil wells in the city of Inglewood, California, to depths of approximately 10,000 feet. The site of these drilling operations was a high pressure field, with initial gas pressures in excess of 3,000 pounds per square inch. The surface locations of these wells are in proximity to industrial and residential areas of Inglewood.

Prior to and during 1946, Basin had both purchased and rented oil well equipment from Baash-Ross. It had never used any Baash-Ross suspension plugs. Basin had been using a type of double suspension plug in its wellhead equipment known as the Regan plug, which was manufactured by another supplier of oil tools in Southern California. Basin had used these Regan double suspension plugs in its wells up to a depth of 9,500 feet without ever encountering a plug failure. A double suspension plug, which is made up of an inner and outer plug, is an oil tool used in the wellhead of an oil well to suspend the tubing. It consists of a doughnut shaped outer plug tapered on the outside to fit in the tubing head, and on the inside to seat the inner plug. The latter is a smaller tapered plug which is screwed to the top of the tubing and actually suspends the tubing in the well.

Basin is one of several oil production enterprises in which its president, C. G. Willis, has an interest. Cecil Winslow was the drilling superintendent for Basin. His responsibilities included the procurement of wellhead equipment for Basin. Winslow had become acquainted with Glen Johnson, chief engineer for Baash-Ross, and early in 1946 he had engaged in several conferences with Johnson with regard to a rock bit he (Winslow) had invented and which he hoped Baash-Ross might manufacture. During one of these private conferences on about April 10, 1946, a discussion occurred regarding the wellhead equipment Winslow had been using. Johnson asked Winslow why Baash-Ross couldn't sell wellhead equipment to Basin or to other organizations for which Winslow worked. Winslow stated he liked the Regan tubing head and their double suspension plug and did not know that Baash-Ross manufactured such a plug; he also said he thought that Regan had a patent on the double suspension plug. Winslow testified that Johnson told him that there were no patents on the plug and that Baash-Ross "could make it as good as Regan." Winslow thereupon replied that he saw no reason "why I

couldn't have Baash-Ross . . . furnish the tubing heads and well head equipment." Subsequent to this conversation Baash-Ross apparently proceeded to design and manufacture the double suspension plugs which it sold to Basin.

On April 17, 1946, about a week after the meeting last described, Baash-Ross wrote a letter to Basin, addressed to Winslow's attention, in which it quoted a list of prices, in response to a verbal inquiry, for wellhead equipment to be delivered to a well known as Simons No. 1 on the Bandini lease. Among the 11 items listed was "1 special Type K modified Tubing Suspension Plug. . . ." Some time after the receipt of this letter, a Baash-Ross double suspension plug was delivered for use on the well referred to in the letter.

In the fall of 1946, Basin began the drilling of its wells in the Inglewood field, and the Baash-Ross double suspension plugs were delivered and used in those wells at the appropriate stage. C. L. Brain, a field man and salesman for Baash-Ross, kept in constant touch with Winslow about the progress of the drilling operation. As soon as the plugs were required to suspend the tubing in the hole, Brain was notified and the equipment was delivered. Winslow testified that he relied on Johnson's statement that Baash-Ross could design and manufacture double suspension plugs "as good as Regan." All of the double plugs used by Basin in the Inglewood field were purchased from Baash-Ross. Three of these plugs failed, causing damage upon which the present actions are founded. Two of these plugs failed during their use by Basin in its wells 5-1 and 1-1 when the inner plug compressed sufficiently to pass through the outer plug, allowing the tubing to drop to the bottom of the 10,000 foot hole. Basin thereupon initiated an action to recover damages, in which it alleged Baash-Ross had breached an express and implied warranty and was guilty of negligence in the design and manufacture of the suspension plugs which Basin had used in wells 5-1 and 1-1. After that case was at issue, another suspension plug sold by Baash-Ross to Basin and used in well 12-1 failed, in that a fracture of the outer plug occurred, which permitted the inner plug with the tubing attached to drop into the hole. Basin filed a second action based upon the same grounds alleged in its prior complaint. Baash-Ross' answer in each case, in addition to certain general denials, pleaded the affirmative defenses of contributory negligence, failure to mitigate damages, and the existence of a written limitation of liability appearing on the Baash-Ross invoices which precluded the re-

covery of damages. Upon the consolidated trial of the cases, the court found for Basin upon all the issues.

Generally speaking, the wells here involved were approximately 10,000 feet deep. At about 1,000 feet, an 11¾-inch casing is inserted and cemented in place. When the well is drilled to its maximum depth, a 7-inch casing is inserted in the 11¾-inch casing and the bottom is cemented in at about 9,000 feet. Then a 4¾-inch perforated liner is installed at the base of the 7-inch casing through the oil-bearing strata. Sometimes 7-inch casing is used extending to the bottom and is gun perforated to permit the gas and oil to enter. Two and one-half inch external upset tubing, open at the bottom, is suspended through the 7-inch casing by means of the suspension plug. Two and one-half inch tubing is run inside the 4¾-inch casing. In flowing wells of the type here involved, the oil and gas is forced into the liner by the formation pressure causing a high pressure inside the casing, which causes the oil and gas to go around the bottom of the tubing and to flow out through the tubing. The pressure outside the tubing is normally much higher than the internal pressure in the tubing. These pressures, as well as the pressure between the surface casing and the 7-inch casing and between the 7-inch casing and the tubing are registered by a gauge in the wellhead assembly. A tubing packer may be used at the bottom of the tubing inside the 7-inch casing to prevent movement of the tube.

The record on appeal includes 13 volumes of testimony, much of it concerned with technical expositions by experts with respect to the manner in which Basin used the plugs and the character of the procedures it employed during its drilling and remedial operations. This evidence will be alluded to in later discussions. A brief chronological summary is first necessary to establish the sequence of events.

The record shows that Basin commenced drilling well 5-1 on December 17, 1947. By March 9, 1948, the maximum depth of 10,326 feet had been reached, whereupon a perforated liner was installed. The next day, a string of 2½-inch tubing had been run into the hole to a depth of 9,540 feet, from which point 2-inch tubing was emplaced to a depth of 10,245 feet. This tubing string was then suspended from the double suspension plug at the head of the well. On March 11, the well came in as a producer, the flow coming through the suspended tubing. Under flowing conditions, the gas pressures were about 2,600 pounds per square inch in the casing and 2,300 to

2,100 pounds per square inch on the tubing. On March 25, 1948, Basin discovered that something was amiss when the gauges indicated that the gas pressures in the tubing and in the casing outside of the tubing had equalized. This condition was discussed by Basin's officers and employees. George Synold, Basin's assistant drilling superintendent, immediately called the matter to the attention of Winslow and Mr. Hall, Basin's production superintendent. These men considered the possibility of the presence of a hole in the tubing, or that the tubing had parted, or the existence of a leak from the packing between the inner and outer doughnuts. No one suggested the possibility of the inner suspension plug having pulled through the outer; Synold stated he had never heard of such a case. The matter received discussion by other officers of Basin, none of whom suspected that a defective suspension plug might be at fault. Meanwhile, the oil and gas were still flowing from the well. Inasmuch as the well continued to produce, and mindful of the hazards and difficulties that would attend the killing of a well with high gas pressure, in an area surrounded by homes and factories, for the purpose of ascertaining what was wrong, Basin's officers decided to permit the well to flow. The well produced through the remainder of 1948 and for more than half of 1949, until the flow began to diminish as the gas pressures dissipated. Its flow ceased entirely on August 26, 1949.

Well 1-1 was the second well in which the Baash-Ross suspension plug failed. Its surface location was 26 feet from well 5-1; and drilling commenced on March 15, 1948, four days after well 5-1 had been brought in as a producer. After the drilling was completed and the tubing suspended, the well came in as a producer on June 26, 1948. About one week later, it was apparent that the gas pressures had also equalized in this well, but it continued to flow as a producer. From the information then available to it, Basin had no reason to attribute the difficulty to the failure of the suspension plug. Production continued until the flow ceased on March 18, 1950, at which time the gas pressures had become dissipated.

In the meantime, before Basin knew the cause of the difficulty experienced in its other wells, the drilling of well 12-1 was undertaken on October 22, 1948. The drilling reached a maximum depth of 10,362 feet, but was plugged back for actual completion at 10,244 feet. A liner was not installed, but the 7-inch casing was gun perforated on January 25. 1949. By January 27, 1949, 2½-inch tubing to a depth of 10,134 feet had been run into the well and suspended from

the Baash-Ross double suspension plug and the well came into flowing production on the same day. Not until July 19, 1950, was any equalization of pressure apparent. On July 26, 1950, its gas pressure had become dissipated and it ceased to produce.

During the interplay of these events, Basin commenced remedial operations to reestablish production in the wells which had been lost. On October 10, 1949, such operations started on well 5-1, which had not produced since August 26, 1949. On October 13, 1949, the outer suspension plug was recovered from the tubing head, at which time it was found that the inner plug, with the tubing attached, was not in place. The inner suspension plug, which had pulled through the outer plug, was found at a depth of 93 feet. In the succeeding weeks, fishing work for the removal of the tubing went on. By November 5, 1949, the tubing was recovered to a depth of 9,919 feet, with 411 feet of 2-inch tubing remaining in the hole. Since the hole could not be regained to the original depth, a window was milled in the side of the liner at 9,675 and a parallel hole drilled through the window alongside the former plugged-up hole to a depth of 10,329 feet. A perforated liner was again run in the well, and by November 29, 1949, 2½-inch and 2-inch tubing was suspended. A Baash-Ross suspension plug was not used. The well resumed production on November 30, 1949.

Similar operations were started on well 1-1 on March 20, 1950, two days after it had ceased to flow. When the outer plug was recovered, it was found that the inner plug had pulled through the outer plug, dropping the tubing into the well. The inner plug with tubing attached was found on March 26, 1950. By April 26, 1950, tubing had been recovered to a depth of 9,779 feet, leaving 577 feet of 2-inch tubing in the hole. To avoid additional fishing, a window was again milled in the side of the liner and a hole drilled parallel to the blocked hole to a depth of 10,390 feet. The next day the presence of a hole in the 7-inch casing was detected somewhere between 2,100 feet and 6,200 feet. A sleeve or string of 4¾-inch casing was inserted in the 7-inch casing at a cost of about $25,000. Following this, the remaining processes for regaining the well were completed, and production resumed on June 7, 1950.

Remedial work on 12-1 began on August 1, 1950. The recovery of the outer plug revealed a different type of failure —a fracture, so that only a part of it remained in the tubing

head. The inner suspension plug and the tubing had fallen into the hole. On August 13, 1950, the inner plug and part of the tubing was recovered from 117 feet down. In the next three days, 2½-inch tubing had been raised from a depth of 9,668 feet. Basin made no attempt to recover the tubing resting in the bottom of the hole.

Mr. Willis, Basin's president, testified the expense of overcoming the mechanical difficulties would be greater than the value of the production which remained. Instead, Basin decided to abandon that oil zone, and obtain production by perforations at a higher place in the liner which would tap a stratum known as the O'Dea zone. A plug was therefore set at 9,610 feet and 2½-inch tubing was landed at 8,881 feet on September 4, 1950, on which day production was obtained at the new level. The damages awarded for the loss of well 12-1 were $42,911.39, based on the cost to Basin to obtain production from the new oil zone.

At the time Johnson informed Winslow that Baash-Ross could make a double suspension plug "as good as Regan," a Baash-Ross catalogue, issued in 1944, was in circulation. On the first page, beneath a red-letter caption entitled "AN IMPORTANT MESSAGE," appeared the following statement: "This is your unqualified guarantee that you will continue to receive in Baash-Ross products only the highest grade of workmanship and materials, regardless of whatever emergency condition prevails." On the inside cover of the last page appears what is called "Terms and Conditions," which cover one half the page. Its language reads in part as follows: "All goods and materials are carefully tested and inspected before leaving point of manufacture, but as it is impossible to always detect imperfections, the only guarantee that is given by us, or for which we are in any way liable, is to replace such goods as prove defective when used for the purpose for which manufactured. . . ." Winslow testified he had never familiarized himself with the contents of the "terms and conditions" set forth in the Baash-Ross catalogue.

The record shows that after each sale of the suspension plugs here involved was consummated and delivery accomplished, Baash-Ross sent to Basin a document, labeled an invoice, containing a list of the items sold and the prices charged. This document, which is a sheet with a Baash-Ross letterhead, contains two sets of parallel lines about ½ inch apart which run horizontally across the page immediately below the space reserved for the addressee, in the upper

quarter of the invoice. Between these lines, in capital letters of easily readable size to one with normal vision, appears this legend: "TERMS: A 2% cash discount will be allowed on this invoice on or before the 20th of the month following date of invoice. Net thereafter." Beneath this is a space reserved for the listing of the invoiced items, which extends almost the length of the page, to a point where it is bordered by two ruled lines which run horizontally along the page about 1½ inches from the bottom. Within the relatively confined space between these lines and the bottom of the page, in small, cramped print, there is to be found the following language: "All quotations and sales are f.o.b. point of shipment unless otherwise expressly stipulated. Carrier's receipt constitutes delivery and our responsibility then ceases. Positively no claims for shortage or damage allowed unless accompanied by original expense bill properly noted by carrier's authorized agent. On account of uncertainty of market, all quotations are subject to change without notice. All statements of date of shipments are estimated and we use our best efforts to ship within the time estimated. All agreements, however, are subject to strikes, accidents and other causes beyond our control. Orders for special goods are not subject to cancellation under any circumstances. *All goods and materials are carefully tested and inspected before leaving point of manufacture, but as it is impossible to always detect imperfections, the only guarantee that is given by us, or for which we are in any way liable, is to replace such goods as prove defective when used for the purpose for which manufactured, f.o.b. at point of delivery to carrier of goods being replaced, or allow credit for such goods at our option. All replaced goods are to be returned to us transportation prepaid. Under no circumstances are we responsible for any damages beyond the price of the goods. No damages or charges of any kind, either for labor, expenses or otherwise, suffered or incurred by the customer in repairing or replacing defective goods, or occasioned by them will be allowed.*

"We certify that to the best of our knowledge and belief, goods covered by this invoice have been produced in conformity with the fair labor standard act of 1938. Any tax imposed by any law on the sale of articles made or sold by this company, shall be in addition to and a part of the sales price thereof.

"All sales made by us (unless otherwise agreed in writing by an executive officer of this company) are made subject

to each and all of the foregoing conditions, and the placing of order by or delivery of such goods or material to the customer, or the use thereof by him, shall be an acceptance by the customer, of all of said conditions.'' (Italics added.)

Winslow testified that he and Mr. Hall customarily initialed the invoices covering items pertaining to their respective departments. He stated he never read the above matter printed on the bottom of the Baash-Ross invoice, and the only other invoice he had read was from another company in 1932. David Todd, who was controller for the Basin company, was responsible for payment of goods bought. He stated that he was aware that most large firms had some ''stipulation'' printed on their invoices relating to conditions of liability for goods sold, although he was not certain of the exact language. He testified he had never objected to the wording of any of the invoices.

Baash-Ross introduced testimony by numerous witnesses regarding a general custom prevalent in the oil industry purporting to limit the liability of a manufacturer of oil well drilling equipment either to replacement of the defective equipment or to an allowance of credit in the amount of the purchase price. Some of these witnesses stated that part of the custom was to guarantee good workmanship and good material, and that if there is good workmanship in the product, the custom is to limit manufacturers' liability to the value of the item sold. There was also testimony that the majority of oil tool companies carry products liability insurance which covers the cost of defense of litigation as well as the risk of liability stemming from the sale of defective goods.

Deferring our consideration of those segments of the record which bear on the subjects of Basin's alleged contributory negligence and the elements affecting the measure of damages awarded, it is here appropriate to summarize the factual findings made by the court. It was found that before April 17, 1946, Baash-Ross orally stated that it could manufacture a double suspension plug for Basin, assuring Basin that its plug would be as good as the Regan plug which Basin was then using. Baash-Ross intended this to be a continuingly effective affirmation, and it was in reliance on this affirmation that Basin purchased the three plugs here involved. Prior to the sale of the plugs, Baash-Ross knew the purpose for which Basin required the plugs, and knew that Basin was relying on Baash-Ross's skill and judgment in designing and manufacturing a plug reasonably fit for the intended use.

After warranting it could make a plug as good as Regan's, Baash-Ross designed, engineered and manufactured double suspension plugs which it sold to Basin, including the three plugs here involved. These three plugs were each not as good as a Regan plug, and failed when used in Basin's wells 5-1, 1-1, and 12-1 for the purpose of suspending tubing.

The court found that after each of the above wells had become productive by a flow through the tubing by formation pressure, Basin observed, on the dates referred to in our previous narration of events, that the gas pressure on the casing and the gas pressure on the tubing in each of the wells had become equalized, but the wells continued to flow as producing wells. Basin had no information that the suspension plugs had failed. By August 26, 1949, well 5-1 ceased to produce as a flowing well; wells 1-1 and 12-1 ceased to produce as flowing wells by March 18, 1950, and by July 26, 1950, respectively. Subsequent to the termination of the flow on each of the wells, Basin commenced remedial operations on each of the wells for the purpose of placing it back in production. Upon the removal of certain of the wellhead equipment in the normal course of such remedial operations, Basin first discovered that the double suspension plug sold to it by Baash-Ross had failed in each of the aforesaid wells and, as a proximate cause of such failure, the tubing dropped into the hole, coiled and became wedged in the casing. The plug failure on wells 5-1 and 1-1 came about when the inner plug which had supported the tubing pulled through the outer plug, which remained in the tubing head. The failure on well 12-1 consisted in the fracturing of the outer plug, permitting the inner plug, which had supported the tubing, to drop into the hole.

As a proximate result of the above described failures, which made it impossible for oil and gas to flow through the tubing to the tubing head, the formation pressure would no longer cause the respective wells to flow. It thereupon became necessary for Basin, in a reasonable effort to salvage the probable values of each of said wells, to proceed with fishing operations for the purpose of removing the tubing from the wells, and to take other necessary action in accordance with good oil field practice, until wells 5-1, 1-1, and 12-1 were again brought into production as flowing wells.

The court found also that none of the plugs here involved was manufactured with the safety factor required to make each such plug reasonably fit for the purpose for which it was sold;

that each such plug was not manufactured with a safety factor adequate to withstand the live-load impacts to which it was subjected, such impacts being within the probabilities of ordinary oil field conditions which Baash-Ross could reasonably have been expected to know and anticipate. Baash-Ross did not use adequate design, testing and safety factors, though this could have and would have insured successful performance by the plugs used by Basin. Baash-Ross was negligent both in designing and manufacturing the plugs used in the three wells, and such negligence proximately caused the failure of the plugs. Basin used due care and was neither negligent in installing each of the plugs nor in the operation of the wells nor in its conduct of the remedial operations required to place the wells back in production.

The court further found that after the sale, delivery and installation of the plugs used in wells 5-1, 1-1 and 12-1, and while those wells were already flowing as producers, Baash-Ross sent Basin three separate invoices listing various items of wellhead equipment, including the suspension plugs here in question. In small print at the bottom of these invoices appeared the statements already quoted. The court found to be untrue the allegations in Bash-Ross's fifth separate defense, among which was the claim that the language appearing on the invoices was a part of the terms and conditions upon which the sales of the plugs were made, that Basin was bound by that language; and that by accepting the plugs and invoices Basin waived all rights it might have had for damages due to the failure of the plugs. The court found that the plugs sold to Basin were newly-designed, having been designed and manufactured by Baash-Ross after its express warranty to Basin that it could make a plug as good as Regan. The plugs were still in an experimental state when sold and Baash-Ross had made no tests of any facsimile or prototype. The plugs sold to Basin had not been carefully tested or tested in any reasonable manner before the sales, nor did Baash-Ross use reasonable methods to make certain that they were fit for the purpose for which they were intended.

The court awarded Basin the sum of $172,350.86, less the sum of $10,906.84 for which Basin was indebted to Baash-Ross, as damages sustained by reason of the failure of the plugs in wells 5-1 and 1-1. A judgment of $42,911.39 was rendered in Basin's favor with respect to well 12-1.

In its brief Baash-Ross "concedes that there was sufficient testimony as to negligence in the design and manufacture

of the plugs to constitute a *prima facie* case in that regard and for purposes of this appeal admits that the findings as to negligence bears (sic) sufficient support in the evidence.'' It contends, however, (1) that the invoices and catalogue contained an express disclaimer of warranty and an exemption from liability for damages due to defective materials, and (2) the general custom of the oil trade restricted its liability for the failure of any equipment to the replacement of the defective part or an allowance of credit therefor. These arguments are without merit.

■ It appears from the record that in order to induce Basin to purchase its suspension plugs, Baash-Ross represented that it could and would make a plug for Basin as good as the Regan plug. Basin relied upon this affirmation in purchasing plugs from Baash-Ross. The sales of plugs were clearly made upon an express oral warranty. (Civ. Code, § 1732; *Stott* v. *Johnston*, 36 Cal.2d 864, 869-870 [229 P.2d 348, 28 A.L.R.2d 580].) ■ There is absolutely no language either in Baash-Ross's catalogue or in its invoices which purports to disclaim the existence of any warranties, express or implied, in connection with its sales. The language of these documents, so far as here pertinent, is as follows: ''All goods and materials are carefully tested and inspected before leaving point of manufacture, but as it is impossible to always detect imperfections, the only guarantee that is given by us, or for which we are in any way liable, is to replace such goods as prove defective when used for the purpose for which manufactured . . . or allow credit for such goods at our option. . . . Under no circumstances are we responsible for any damages beyond the price of the goods. No damages or charges of any kind, . . . suffered or incurred by the customer in repairing or replacing defective goods or occasioned by them, will be allowed.'' Far from disavowing any express warranty which Baash-Ross might expressly make, or disclaiming other warranties which the law implies, this language explicitly affirms and warrants that all goods are ''carefully tested and inspected'' before delivery. However, in the event imperfections in the goods escape detection despite careful testing and inspection, the quoted language announces that Baash-Ross's responsibility shall be restricted to replacement of the defective goods or the amount of the purchase price. In short, having warranted that its goods are carefully tested and inspected, and no specific disclaimer of express or implied warranties appearing, this language is clearly designed to protect Baash-

Ross from the measure of damages normally flowing from breach of warranty by limiting its liability to the price of the goods sold. But Baash-Ross's liability in the instant case is predicated not alone on breach of warranty, but on findings of affirmative negligence which proximately caused the damages here sustained. The question posed, therefore, is whether the quoted language exculpates Baash-Ross from the consequences of its own negligence.

Thus, the main problem is one of construction, namely, whether there is any clear indication that Baash-Ross was attempting to shed its ordinary responsibility to a customer by exempting itself from the consequences of its own fault. It becomes unnecessary, therefore, to consider the question of whether Basin was bound by the terms and conditions contained in a catalogue which Mr. Winslow testified he was unfamiliar with, or by language of limitation of liability appearing on invoices sent after the completion of a sale made subject to warranties. We have had recent occasion to indulge in extended consideration of these precise issues in *India Paint & Lacquer Co.* v. *United Steel Products Corp.*, 123 Cal.App.2d 597, 605-613 [267 P.2d 408] (hearing denied by Supreme Court). For present purposes, we may grant, *arguendo*, that the terms and conditions in the catalogue and in the invoices were imported into the transaction under which the plugs were sold. The language therein, however, falls far short of manifesting that it was the intent of the parties that Baash-Ross was to be relieved of the consequences of its own negligence. (*Butt* v. *Bertola*, 110 Cal.App.2d 128, 138-140 [242 P.2d 32]; *Doughnut Mach. Corp.* v. *Bibbey*, 65 F.2d 634, 637.)

█ In cases where the public interest or some statutory prohibition are not involved, it is permissible for a party to a contract to absolve himself from liability for future negligence. (*Stephens* v. *Southern Pac. Co.*, 109 Cal. 86 [41 P. 783, 50 Am.St.Rep. 17, 29 A.L.R. 751]; *Nichols* v. *Hitchcock Motor Co.*, 22 Cal.App.2d 151 [70 P.2d 654].) █ Nevertheless, the law does not look with favor upon attempts to avoid liability or secure exemption for one's own negligence, and such provisions are strictly construed against the person relying upon them. (*Pacific I. Co.* v. *California, etc., Ltd.*, 29 Cal.App.2d 260, 274 [84 P.2d 313]; *Hollander* v. *Wilson Estate Co.*, 214 Cal. 582, 585 [7 P.2d 177]; *Doughnut Mach. Corp.* v. *Bibbey, supra*; *Johnson* v. *Fargo*, 98 App.Div. 436 [90 N.Y.S. 725, 730]; affm'd (*sub nom. Johnston* v. *Fargo*,

184 N.Y. 379 [77 N.E. 388, 7 L.R.A.N.S. 537]; *Standard Ins. Co. of N. Y.* v. *Ashland Oil & Ref. Co.,* 186 F.2d 44, 46-48; *Cerny Pickas & Co.* v. *C. R. Jahn Co.,* 347 Ill.App. 379 [106 N.E.2d 828, 831]; *Winkler* v. *Appalachian Amusement Co.,* 238 N.C. 589 [79 S.E.2d 185, 190]; *Glant* v. *Lloyd's Register of Shipping,* 141 Wash. 253 [251 P. 274, 277-278]; 17 C.J.S. Contracts, § 262; 6 Williston on Contracts, p. 5169 and cases cited in note 8; see *Pure Torpedo Corp.* v. *Nation,* 327 Ill. App. 28 [63 N.E.2d 600, 606-607].) ██ It is also well settled that a document is to be construed strictly against its drafter. (*Pacific Lbr. Co.* v. *Industrial Acc. Com.,* 22 Cal.2d 410, 422 [139 P.2d 892]; *E. A. Strout Western Realty Co.* v. *Gregoire,* 101 Cal.App.2d 512, 517 [225 P.2d 585].) ██ In harmony with this canon of construction, where the language of an instrument purporting to exculpate one of the parties for its future negligence was prepared entirely by the party relying on its terms, words clearly and explicitly expressing that this was the intent of the parties are required (*Pacific I. Co.* v. *California, etc., Ltd.,* 29 Cal.App.2d 260, 274 [84 P.2d 313]; *Butt* v. *Bertola,* 110 Cal.App.2d 128, 138-140 [242 P.2d 32]; *Doughnut Mach. Corp.* v. *Bibbey, supra; Winkler* v. *Appalachian Amusement Co., supra; Paddle* v. *Atlantic Basin Iron Works,* 91 N.Y.S.2d 336, 338; 17 C.J.S. Contracts, § 262). As stated in *Pacific I. Co.* v. *California, etc., Ltd., supra,* " 'the provision of a contract relieving one of the parties thereto from liability for his or its own negligence should be clear and explicit. While it is true that the language used in the quoted provision of the contract before us, that the agent shall hold the company 'harmless from all claims, suits, and liabilities of every character whatsoever and how-soever arising from the existence or use of the equipment at said station' is broad and comprehensive, it is, as stated by the court below, provocative of some doubt. The defendant itself wrote the provision into the contract for its own benefit. It could have plainly stated, if such was the understanding of the parties, that the plaintiff agreed to relieve it in the matter from all liability for its own negligence. As it did not do so, we resolve all doubt, as we should, in favor of the plain-tiff, and hold that it was not the intent of the parties to give to the contract as written the effect claimed by the company.' "

These principles are pertinent to our inquiry as to whether the language in question is broad enough to exempt Baash-Ross from all manner of negligence upon its part in con-nection with its manufacture and sale of the suspension

plugs. ■ The terms and conditions in the catalogue and the invoices must be construed most strongly against Baash-Ross as being the product of its own draftsmanship and designed to whittle down the normal and ordinary rights of a customer. (*Burr* v. *Sherwin Williams Co.*, 42 Cal.2d 682, 693, 694 [268 P.2d 1041].) ■ Examined in their entire context, it is patent from an analytical reading of the documents in question that they go no further than to limit Baash-Ross's liability for breach of warranty. Their language indicates that it is fundamental that reasonable care in relation to the manufacture of the product will be used. ■ But a seller's obligation to a buyer for breach of warranty is one of strict and absolute liability. (*Mary Pickford Co.* v. *Bayly Bros., Inc.*, 12 Cal.2d 501, 520 [86 P.2d 102]; *Prosser on Torts*, pp. 741, 742.) ■ Where a breach of warranty is established, liability is imposed entirely independent of the question of negligence on the part of the seller. (*Vaccarezza* v. *Sanguinetti*, 71 Cal.App.2d 687, 689 [163 P.2d 470]; *Patterson* v. *Orangeburg Fertilizer Co.*, 117 S.C. 140 [108 S.E. 401, 405]; Williston on Sales, §§ 237, 237a.) The sense of the conditions on the documents indicates a dominant purpose to escape from the full consequences of such strict liability. The language quoted plainly shows that Baash-Ross, asseverating that it would carefully test and inspect its products, was seeking exculpation not from its own affirmative negligence as a manufacturer and supplier of goods but from liability that might be fastened upon it from sales of goods which might prove defective despite its exercise of reasonable care. In short, its liability was limited in the event of a breach of any warranty upon which the sales were made and not in the event of a breach of its duty of care to its customers. (*Doughnut Mach. Corp.* v. *Bibbey*, 65 F.2d 634, 637. See *Butt* v. *Bertola*, 110 Cal.App.2d 128 [242 P.2d 32]; *Pure Torpedo Corp.* v. *Nation*, 327 Ill.App. 28 [63 N.E.2d 600, 606-607].) It is true that such language as "Under no circumstances are we responsible for any damage beyond the price of the goods. No damages . . . suffered . . . by the customer in repairing or replacing defective goods, or occasioned by them will be allowed," if isolated from its context and read without regard to the maxims of strict construction here applicable, is of broad scope. "Such broad language, however, is to be read in the light of the subject matter of the contract and the apparent intention of the parties." (*Eastman Oil etc. Corp* v. *Lane-Wells Co.*, 21

Cal.2d 872, 873 [136 P.2d 564]; *Butt* v. *Bertola, supra,* 138.) Certainly there is here no mention of negligence nor a clear and explicit indication that Baash-Ross was attempting to relieve itself from the consequences of its own fault. As author of the words employed, Baash-Ross had it in its power to relieve itself from all obligations or liabilities, including that of negligence, by the use of appropriate language. (*Pacific I. Co.* v. *California, etc., Ltd., supra.*) We are in accord with the trial court's view that the language on the invoices does not exculpate Baash-Ross from liability in tort for its negligence. Baash-Ross concedes that the findings as to such negligence are sustained by the evidence.

There is no merit in Baash-Ross's contention that the trial court erred (1) in not rendering judgment in conformity with testimony as to a general custom in the oil-tool trade limiting the liability of a manufacturer to replacement of defective merchandise or allowance of credit on the purchase price, and (2) in not making any finding on the subject. ▮ It is axiomatic that accompanying the undertaking on the part of Baash-Ross to design a plug as good as Regan was its common law duty to Basin to accomplish the thing agreed upon with reasonable care and skill, and its negligent failure to observe this duty was a tort as well as a breach of contract. (*Roscoe Moss Co.* v. *Jenkins,* 55 Cal.App.2d 369, 376 [130 P.2d 477].) ▮ The evidence produced on the subject of the custom of the industry clearly indicates it is expected the manufacturer will use every reasonable method to assure that the tools and equipment sold are fit for the intended purpose. The evidence goes no further than to establish that, on the premise that the manufacturer has exercised reasonable care in fabricating the goods purchased, the buyer does not look to the manufacturer to respond in damages for a failure of the equipment. His sole recourse then is reimbursement of the purchase price or replacement of the equipment. But this is far short of showing the prevailing custom to be that an oil-tool company's liability is limited to the price of the article regardless of its negligence in design and manufacture, as is the case here. The reasonable inferences from the evidence are to the contrary. This appears most lucidly from the testimony of one of Baash-Ross's own witnesses, Mr. Chestnut, under cross-examination: "Q. As I understand your testimony of the custom, it was that the manufacturer does guarantee good workmanship and good

material in his product? A. Yes. Q. That is also part of the custom? A. Yes. Q. And then if there is good workmanship and good material in his product it is the custom to limit his liability to replacement of the product or the value of the product if something goes wrong, is that right? A. Yes, sir.'' In the instant case, good workmanship and good material in the Baash-Ross plugs were not established—on the contrary, the court expressly found negligence both in design and manufacture. It would be an extraordinary business usage, indeed—and one certainly not reflected by any judicious reading of the record—which would universally restrict a manufacturer's liability to the price of the goods regardless of his negligence in constructing the equipment and without regard to the subsequent consequences of such negligence.

Baash-Ross cannot successfully complain of the court's failure to find on the issue of custom when, in the light of the evidence, the facts actually found and the judgment rendered, the finding would have been adverse to it. (*Logan* v. *Forster*, 114 Cal.App.2d 587, 596 [250 P.2d 730]; *Walpole* v. *Pre-Fab Mfg. Co.*, 103 Cal.App.2d 472, 481 [230 P.2d 36].) ''Where an omitted finding must be inferred from a consideration of the findings actually made, an appellate court will recognize the necessary inference and consider the finding in question as having in effect been made (citing cases).'' (*Logan* v. *Forster, supra.*)

Baash-Ross contends that Basin was guilty of contributory negligence because (1) it failed to install thread protectors in the inner plugs used in wells 5-1 and 1-1, and (2) it did not have the plugs installed under the supervision of a Baash-Ross service man, provided without charge. In so contending, Baash-Ross urges us to conclude that this constituted contributory negligence by emphasizing, out of a mass of conflicting evidence, testimony favorable to itself. It points out that tests conducted by its expert witness indicated that the presence of thread protectors in inner plugs strengthened their capacity, and urges that if thread protectors had been used, the plugs in wells 5-1 and 1-1 would not have failed in the manner described. Although the plug in well 12-1 failed despite the use of a thread protector, Baash-Ross urges that this was due to improper installation of the plug, which would have been obviated if Basin had availed itself of the free services of a Baash-Ross man skilled in these matters.

These contentions must prove unavailing when con-

sidered with reference to the rule that a reviewing court will uphold findings based on substantial evidence, resolving conflicts in the evidence in favor of the prevailing party, and drawing all reasonable inferences in support of the findings. (*Sheeter* v. *Lifur*, 113 Cal.App.2d 729, 735 [249 P.2d 336].)

The court obviously credited Mr. Winslow when he stated that he did not recall anyone from Baash-Ross saying that thread protectors had to be used or that the plugs should not be installed except under the direction of a Baash-Ross service man. Edmond Wagner, Basin's expert witness, testified that thread protectors are ordinarily used only to protect the threads and unless special instructions had been given it could not be assumed they had any other purpose. He testified it was normal procedure in oil fields to remove the thread protector after the part is installed; that the thread protector added little to the strength of the plug until the inner plug had been pulled down by the load into the outer plug, at which time the suspension plug had already failed in performing its normal function. Mr. Synold testified that Baash-Ross led him to believe that the only purposes of the protectors were for the protection of the thread and that he used the Regan plug without thread protectors. He and other witnesses described how they installed the plugs. The memorandum of decision prepared by the trial judge discloses that he analyzed with meticulous and painstaking deliberateness the evidence relating to Baash-Ross's attempt to exonerate the plugs of blame for their failure and to ascribe responsibility therefor on Basin's inept installation and negligent methods of operation. The court's opinion reads in part: "A considerable and sincere effort was made in the trial to clear the plugs themselves of blame for their failure and to place the blame on alleged inexpert or negligent practices of the plaintiff. . . . Aside from purely speculative matters upon which findings of fact could not be made, defendant points to these factors of alleged negligent conduct on plaintiff's part: (1) Thread protectors were not used in two of the plugs. (2) The plugs were not seated properly when first placed in the well-head assembly. . . . The evidence does show that thread protectors were not placed for permanent retention in the inner plugs used in wells 5-1 and 1-1; and we have evidence, even from Mr. Winslow, that thread protectors ordinarily are so used in the inner plug. But we have no evidence—at least none that convinces the trier—that thread protectors ordinarily are used for any

purpose except to protect the threads, that they are used for the purpose of reinforcing and building up the safety factor of the plug or that they generally or usually are regarded as necessary for such a purpose. We have no evidence that any notice was given by defendant to plaintiff to the effect that the thread protector was necessary or advisable to provide an adequate safey factor or that the plug had been designed with reliance on the use of a thread protector to provide an adequate safety factor. The court is convinced that practical men in the field ordinarily look upon a thread protector as having no essential purpose other than that which the name implies.

"As to the handling and seating of the plugs when installed in the well-head assembly, I firmly believe that Mr. Synold's description of the operation was truthful, and the evidence has not shown a better method, commonly practiced, of doing the job than that which he described." Thus the trial court has resolved the conflicting evidence on these factual matters against Baash-Ross on substantial evidence. Such resolution, which is reflected in the findings, is binding on this court.

Baash-Ross's next point is that the court erred in applying a measure of damages based on the cost of remedial operations undertaken 18 months after the failure of the plugs instead of assessing damages on the basis of remedial operations promptly instituted. It argues that if the wells had been promptly killed, most of the damage suffered by Basin would have been avoided. In conjunction with this argument, Baash-Ross asserts the court ignored Basin's contributory negligence with respect to its drilling procedures, which contributed to the damage. Once again Baash-Ross is in effect asking this court to reevaluate the conflicting testimony of expert witnesses having practical and theoretical experience in all phases of oil production and oil well drilling and draw inferences contrary to those drawn by the trial court. We may not, however, arrogate to ourselves such fact-finding function. It is true that Baash-Ross's witnesses testified that immediately upon the equalization of the tubing and casing pressures, *they* would have taken steps to investigate the causes and remedy the situation. Baash-Ross argues that the delay resulted in the seepage of sand from the oil formation onto the bottom of the casing, which trapped and prevented removal of part of the tubing. Other witnesses testified as to the type of devices *they* would have used to make

tests. Baash-Ross further contends that many of Basin's practices showed negligence in its *modus operandi*—such as running the tubing too close to the bottom of the well, failure to allow sufficient clearance space between tubing and liner to facilitate ''wash-over'' of the tubing inside the liner, failure to use packing to minimize vibration of the tubing, the improper closing of the master valve, and the like. However, Basin, for its part, introduced testimony to show its practices were in accord with approved standards. Basin's witnesses testified that good oil well practice did not require immediate remedial work. There was evidence that it would have been hazardous to attempt to kill the wells when they were under great pressures. C. G. Willis stated that damages from loss of production might have been greater if the wells had been killed while producing. He stated the practical thing to have done was to allow the flow to continue. Robin Willis, a geologist, testified he recommended that 5-1 be allowed to produce after equalization because the well might have been injured if killed. The sum and substance of the testimony showed that various differences of opinion as to the course of action which Basin should have pursued existed among men versed in the oil well drilling business. The most that can be said for the testimony of Baash-Ross's experts is that they would have used other methods than Basin employed and that they would have taken remedial action despite the fact that the wells were producing oil. This is far from establishing that Basin's reaction to the crisis confronting it was unreasonable or the methods it adopted were imprudent. Under the circumstances thus appearing, it was a question for the trier of fact as to whether Basin was guilty of negligence and a failure to act reasonably to mitigate the consequences flowing from Baash-Ross's negligence.

The court cogently crystallized the problem thus presented in the following language which we adopt as to these points: ''As to the manner of shutting off the master valve, and the effects thereof, I believe that defendant's testimony on the subject was highly speculative, and I would find it extremely difficult to make a finding attributing any significant blame to plaintiff for a negligent practice in respect to this operation.

''Mr. Law's testimony concerning the use of guy wires and their effect in preventing vibration carries a good deal of weight with me as a recommendation for ideal practice,

but the evidence falls short of convincing me that such installations are an ordinary or common procedure or are commonly in the field considered necessary or even advisable to prevent the failure of suspension plugs. . . .

"A contention sincerely and forcefully advocated by defendant is that after the tubing pressure and the casing pressure equalized, plaintiff was negligent in not handling the situation properly and in not taking steps that would have mitigated greatly the damages resulting from the failure of the plugs.

"It is a firmly established principle of law that 'a person injured by the wrongful act of another is bound to exercise reasonable care and diligence to avoid loss or minimize the resulting damages and cannot recover for losses which might have been prevented by reasonable efforts and expenditures on his part.' *Valencia* v. *Shell Oil Co.*, 23 Cal.2d 840, 844 [147 P.2d 558].

"This duty of the injured person, it will be noted, is not one that can be expressed in absolute terms for general application. The duty is to exercise *reasonable* care and diligence; and what is reasonable in a given situation is determined by the facts, knowledge and problems then existent in relation to the person in trouble, the injured person, and his point of view at the time.

"The men responsible for the decisions of the plaintiff were intelligent, provident, experienced men, with a combined scholastic and field education covering an impressive number of years and bearing impressive significance. It is certain, I think, that, when they were called upon to make the decision in question, they gave not the slightest thought to possible litigation or to a possible claim against defendant, and were concerned solely with the question of what course of action would be most advantageous financially to the plaintiff, on the assumption that plaintiff alone would bear the financial burden of the trouble encountered. They were confronted by an unusual, if not a unique, situation, wholly unexpected as a probability. The evidence shows that in each instance they gave thoughtful, conscientious consideration to the emergency, applied their best judgment to the situation, always with the goal of accomplishing the best salvage, financially, that seemed to them to be practicable. Even a firm opinion held now that a different course from that which was followed would have been financially advantageous, would not in itself, justify a finding that plaintiff's

executives, experts and managers failed to exercise reasonable care and diligence. I believe that they did exercise reasonable care and diligence to avoid loss and to minimize the resulting damages, even if their judgment was wrong as we now see the facts.''

Baash-Ross's next assignment of error relates to the re-drilling operations in connection with well 1-1. After the new liner had been run into this well, it was discovered that there was a hole in the 7-inch casing, causing a leak some-where between 2,100 and 7,500 feet. Because of this leak, a 4¾-inch sleeve was inserted in the 7-inch casing at a cost of about $25,000. Baash-Ross contends that this item was erroneously included as a part of the damages, asserting it is not in any way referable to the failure of the plugs and the dropping of the tubing. It argues that the leak was due either to the weakness of the type of casing used or was caused by redrilling operations without the use of neoprane rubber protectors around the drilling pipe to prevent it from injuring the casing. Baash-Ross's argument is predicated on the thesis that no causal connection was established be-tween its negligence and the occurrence of the leak in the casing.

In considering this argument, the controlling rule of law is clear: ''The whole doctrine of responsibility for negligence is based upon the postulate that without such negligence the injury would not have occurred, or, in other words, that the negligence is the proximate cause of the injury.'' (*McVay* v. *Central Calif. Inv. Co.*, 6 Cal.App. 184, 188-189 [91 P. 745]. See *Feldesman* v. *McGovern*, 44 Cal.App.2d 566, 569 [112 P.2d 645].) The question of whether defendant's negligence was the legal cause of plaintiff's injury, i.e., whether plaintiff has sustained the burden of establishing that defendant's negligence was the cause in fact from which his injury proximately resulted, is ordinarily for the trier of the facts. (*Shaw* v. *Owl Drug Co.*, 4 Cal.App.2d 191, 196 [40 P.2d 588]; *Been* v. *Lummus Co.*, 76 Cal.App.2d 288, 294 [173 P.2d 34]; Prosser, *Proximate Cause in California*, 38 Cal.L.Rev. 369, 375.) Baash-Ross points to the indication that leaks developed in the casing of certain other Basin wells. Its expert, Mr. Law, testified that in his opinion the leak was primarily due to the lightness of the casing used and was not necessarily related to the redrilling operations. He stated he could not attribute the leak to the dropping of the tubing. Basin's

witnesses, however, gave testimony in opposition. The record shows that the remedial operations required extensive redrilling, which of itself subjected the casing to additional strain. Richard Ballantyne testified that the casing had sufficient collapse and tensile strength to handle what was normally required of it; that protectors are often not used with oil-based drilling fluids because the oil works on the rubber, causing the protectors to come off and create trouble. Mr. Winslow testified that while just a dropping of the tubing would not cause a hole in the casing, "dropping the tubing will create a leak." Also, he disputed the advisability of using rubber protectors in the redrilling of well 1-1 under the conditions there prevailing. Considering the evidence and the legitimate inferences in favor of Basin, the court was warranted in finding that the leak was either caused directly by the dropping of the tubing or as a consequence of the stresses and strains of the redrilling operations required to restore the well to production. In sum, there was testimony by expert witnesses which, when considered with all the circumstances established by the evidence, justified the finding that Baash-Ross's negligence was the cause in fact and the proximate cause of this injury. (*Shaw* v. *Owl Drug Co., supra*; *Burford* v. *Baker*, 53 Cal.App.2d 301, 306, 308 [127 P.2d 941]; *Been* v. *Lummus Co., supra*.)

The last point urged by Baash-Ross is that the finding as to the damage caused to well 12-1 is unsupported by the evidence. This contention must be sustained.

The circumstances accompanying the remedial and redrilling operations undertaken upon the cessation of production in 12-1 evince a situation radically different from that obtaining in connection with wells 5-1 and 1-1. The record shows that 12-1 was the most easterly well, and was drilled as an exploratory hole. No liner was installed, but the casing was set to the bottom so the zones which looked promising could be selectively perforated. C. G. Willis testified there was considerable doubt as to whether 12-1 would produce at all. When it was first drilled, the drillers passed through an oil zone known as the O'Dea stratum without realizing it. It was completed to an effective depth of 10,244 feet, and Mr. Willis testified it was apparent 12-1 was not going to pay for its original drilling cost. After the flow terminated on July 23, 1950, remedial operations were commenced on August 12, 1950. By August 19, 2½-inch tubing to a depth of 9,668 feet had been recovered. No attempt

was made to recover the remaining tubing in the bottom of this hole. Mr. Willis stated that the mechanical difficulties of getting all the tubing out of 12-1 would entail an expense greater than the income which could be derived from the amount of production remaining in the well. Mr. Willis therefore determined to abandon the zone from which 12-1 originally produced. A bridging plug was set at 9,610 feet, the effect of which was to seal off the part of the hole with the tubing. The lease on 12-1 was quitclaimed shortly thereafter to the landowner. It was decided to test the O'Dea zone, which was at a higher horizon in the same hole, although Basin had not previously tried producing from this zone. Two and one-half inch tubing was landed at 8,881 feet, the casing was gun perforated, and this well came in as a flowing producer on September 4, 1950. The well, which was drilled from the same surface location as the abandoned 12-1, was now producing from an oil sand different from that tapped in the original 12-1, and was renamed 4-2 under a different lease. The cost to Basin of obtaining production at this lesser depth from a different zone was $42,911.39, which was the amount assessed as damages for the loss of well 12-1.

Mr. Law, the petroleum engineer called by Baash-Ross, testified that he was familiar with the methods of appraisal of low production wells and in general terms of the market value of a well. In response to an inquiry as to the fair market value of well 12-1 just prior to the equalization of pressure, Mr. Law testified that such value was $19,500. This was broken down as follows—$12,000 as the worth of the anticipated oil, $7,000 for the value of the tubing, and $500 as the worth of the surface fittings. Basin did not deny the value placed on this well by Law, nor did any other witness name any other sum. Mr. Willis testified that the operations in each of the wells were reasonably necessary in order to recomplete the wells.

The measure of damages which may be recovered as the result of the tortious conduct of another is that amount which will compensate the injured party for all the detriment proximately caused thereby, whether it could have been anticipated or not. (Civ. Code· § 3333.) It is a fundamental principle of the law of damages, however, that the compensation received shall be commensurate with the injury, and no more. (*Hähn* v. *Wilde*, 211 Cal. 52, 55 [293 P. 30]; *Avery* v. *Fredricksen & Westbrook*, 67 Cal.App.2d 334, 336 [154 P.2d 41]; 15 Am.Jur., p. 400.) Ordinarily, the

law will not put the injured party in a better position than he would be in had the wrong not been done. (*Avery* v. *Fredricksen & Westbrook, supra,* p. 337.)

When Basin owned the lease under which 12-1 was being operated it was possessed of a *profit à prendre,* which is an interest in the land. (*Dabney-Johnston Oil Corp.* v. *Walden,* 4 Cal.2d 637, 649 [52 P.2d 237]; *Carlson* v. *Lindauer,* 119 Cal.App.2d 292, 304 [259 P.2d 925].) Basin's own testimony shows that there was not enough production remaining in the 12-1 oil zone to justify the expense of removing the tubing and resuming production therefrom. In effect, then, this well was completely destroyed as a result of Baash-Ross's negligence and it was abandoned by Basin when it realized further remedial operations were economically unwarranted.

There is no fixed, inflexible rule for determining the measure of damages for injury to, or destruction of, property; whatever formula is most appropriate to compensate the injured party for the loss sustained in the particular case, will be adopted. (*Natural Soda Prod. Co.* v. *City of Los Angeles,* 23 Cal.2d 193, 200-201 [143 P.2d 12]; *Givens* v. *Markall,* 51 Cal.App.2d 374, 379 [124 P.2d 839]; 15 Am.Jur., pp. 514, 515.) In *Kell* v. *Jansen,* 53 Cal.App.2d 498 [127 P.2d 1033], a case involving damage to plaintiff's land due to the negligence of defendants, the court stated (p. 503): "The rule laid down in *Green* v. *General Pet. Corp.,* 205 Cal. 328, 336 [270 P. 952, 60 A.L.R. 475], is that if the cost of repairing the injury and restoring the premises to their original condition amounts to less than the value of the property prior to the injury, such cost is the proper measure of damages; and if the cost of restoration will exceed such value then the value of the property is the proper measure." In *Salstrom* v. *Orleans Bar Gold Min. Co.,* 153 Cal. 551, 558 [96 P. 292], where plaintiff's property was covered by debris from defendant's mining operations, the court said that if the cost of removing the debris would amount to less than the value of the property as it was prior to the injury, the cost would be the proper measure of damages; but if the cost of removal would exceed such value, then the value of the property would be the proper measure. This rule has been applied where an oil well has been destroyed by a defendant's negligence. In *American Glycerin Co.* v. *Kenridge Oil Co.,* (Tex.Civ.App.) 295 S.W. 633, an action for damages caused by a premature explosion of a nitroglycerin

shell while it was being lowered into an oil well, the court stated (pp. 636-637): ''We suggest that upon another trial of this case evidence should be admitted and the jury called upon to determine in answer to a proper special issue whether or not the well could have been reproduced by drilling another one. If so, the correct measure of damages would be the cost of reproducing and equipping same in the manner that this well was equipped, less the value of any salvage realized by appellees, provided the cost would not exceed the value of the well. Should the cost of reproduction as found by the jury exceed the value of the well, as found by them, or should the jury determine upon competent testimony that the well could not have been reproduced, the damages should be assessed at the reasonable, cash market value of the well as equipped immediately preceding its destruction, less the value of any salvage realized by appellees.'' In *United States Torpedo Co.* v. *Liner,* (Tex.Civ.App.) 300 S.W. 641, an oil well was virtually destroyed by defendant's negligence, which rendered it worthless as a means of producing oil and gas from the leasehold. The court stated (p. 647): ''The testimony in this case shows that the well had a cash market value before the explosion, and that the salvaged casing had a cash market value. Under the circumstances in this case, the measure of damage for the tortious destruction of the well is the difference in the cash market value of the well immediately before the injury and that amount of the cash market value of the salvage remaining after deducting the expense of salvaging, provided such expense does not exceed the value of the salvage. [Citations.] In a case of this kind the owner would, in addition to the above, be allowed to recover any reasonable expense incurred by him in a prudent attempt to save the well after the injury [citation].''

Basin's own proof showed that the injury to 12-1 was not reparable—that the cost of restoration of its flow would exceed the value of the remaining production. Basin was therefore compelled to abandon the oil formation under the 12-1 leasehold as totally lost. For the destruction of its property under such circumstances, Basin was entitled to recover an amount equal to the value of its well as it existed prior to the cessation of production, plus any reasonable expense incurred in its effort to restore the well to production up to the time of its determination that further efforts at restoration were impractical, less the value of any salvage realized. (*Green* v. *General Petroleum Corp.,* 205 Cal. 328,

336 [270 P. 952, 60 A.L.R. 475] ; *Salstrom* v. *Orleans Bar Gold Min. Co.,* 153 Cal. 551, 558 [96 P. 292] ; *American Glycerin Co.* v. *Kenridge Oil Co., supra; United States Torpedo Co.* v. *Liner, supra.*) A measure of damages based on these factors, which would have fully compensated Basin for the loss of the oil zone from which 12-1 produced, as well as for other items of expense reasonably incurred, was within the scope of the issues, as developed during the trial.

The court did not apply this measure of damages. It made no finding as to the value of the well prior to the time production ceased, nor of the reasonable cost of Basin's remedial operations before it decided that the restoration of 12-1 would be futile. The only evidence as to the value of 12-1 immediately prior to the cessation of production is the opinion of Mr. Law that the well was worth $19,500. The court allowed the sum of $42,911.39 as the measure of damages, which was the amount expended to obtain oil production from the O'Dea zone, on the theory that this amount was the cost of regaining the lost well. However, unlike the situation which prevailed with respect to wells 5-1 and 1-1, the remedial operations on 12-1 never resulted in regaining the original oil zone. As has been indicated, 12-1 was never restored to production—it was given up as lost. The sum of $42,911.39 which was awarded included the cost of exploring and drilling a new well at a different level to produce oil from a hitherto untapped oil zone under a different lease. To award this amount without a determination that such amount did not exceed the value of the original well immediately prior to the cessation of production, plus the legitimate costs of operations to save such well was error. (See *Green* v. *General Petroleum Corp., supra; Salstrom* v. *Orleans Bar Gold Min. Co., supra; American Glycerin Co.* v. *Kenridge Oil Co., supra; United States Torpedo Co.* v. *Liner, supra.*) By way of simple analogy, if an automobile is wrongfully demolished and its owner procures another to replace it, it is at once apparent that to allow an amount equal to the cost of the replacement without ascertaining the value of the thing lost would be to omit a fundamental consideration in the determination of what constitutes fair compensation for the injury. Similarly, unless Basin established that the value of 12-1 prior to the termination of production, plus the reasonable costs of its attempt to restore production in such well, was at least equal to the sum of $42,911.39, there is no justification for the award of such amount. For

clearly, if the total of these items should be less than the amount awarded, Basin would be in a better position than it was before the injury and Baash-Ross would be subjected to excessive damages. (Civ. Code, § 3359.) In such a circumstance, Baash-Ross would be underwriting the financing of a new well in a new zone rather than compensating Basin for the value of the well lost through its negligence. Since there was a failure to find on these crucial items, and since it is only upon the basis of a determination of these items that Basin's damages can be properly assessed, the judgment in case No. 580394 must be reversed with directions to try only the issue of damages. (*Royer* v. *Carter,* 37 Cal.2d 544, 551 [233 P.2d 539].)

The case of *Alphonzo E. Bell Corp.* v. *Listle,* 74 Cal.App.2d 638 [169 P.2d 462], is not applicable. In that case, a prospect hole had been destroyed and the court allowed as the measure of damages the amount of money necessary to redrill the ·well to the horizon at which destruction occurred. This was the most equitable means of compensating the owner, since there was no way of knowing whether the hole would ever be a producer and, if so, what profits would be made.

The judgment in case No. 570372 is affirmed. The judgment in case No. 580394 is reversed with directions to retry only the issue of damages in accordance with the views expressed herein. Costs on appeal are apportioned as follows: Seventy-five per cent (75%) of such costs to be paid by appellant; twenty-five per cent (25%) by respondent.

Moore, P. J., and McComb, J., concurred.

Petitions for a rehearing were denied June 23, 1954, and appellant's petition for a hearing by the Supreme Court was denied July 21, 1954. Traynor, J., was of the opinion that the petition should be granted.