In re KAISER MERGER LITIGATION.

KSC RECOVERY, INC., Plaintiff,

v.

The FIRST BOSTON CORPORATION, Touche Ross & Co. n/k/a Deloitte & Touche, Irwin L. Jacobs, Daniel T. Lindsay, Gerald A. Schwalbach, and Dennis M. Mathisen, Defendants.

Bankruptcy No. 87 B 01552.
Civ. A. No. 89–K–1178.

United States District Court,
D. Colorado.

June 22, 1994.

G. Stephen Long and John P. Baker, Coghill & Goodspeed, Denver, CO, and Marty Harper, Lewis and Roca, Phoenix, AZ, for plaintiff.

William C. McClearn, William W. Maywhort and Geraldine A. Brimmer, Holland & Hart, Denver, CO, for First Boston Corp.

Joseph E. Meyer, III and Michael E. Romero, Pendleton & Sabian, P.C., Denver, CO, for individual defendants.

George B. Curtis, Craig R. Carver and Peter H. Van Veen, Gibson, Dunn & Crutcher, Denver, CO, for Touche Ross & Co.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

Before me are four motions for summary judgment filed by the defendants in the consolidated *First Boston,*[1] *Jacobs,*[2] and *Touche Ross*[3] actions ("Defendants"). Chapter 11 debtor KSC Recovery, Inc. ("KSC") initiated these professional and shareholder liability actions seeking damages and the recovery of transfers associated with the February 1984 Leveraged Buyout ("LBO") of Kaiser Steel Corporation ("Kaiser") and related events. KSC claims that as a result of the Defendants' actions, Kaiser went forward with the LBO at a time when it was insolvent or would be rendered insolvent by it, and that it has remained insolvent since then. Defendants deny any responsibility for Kaiser's insolvency, and seek summary judgment on all of KSC's claims. After examining the briefs of counsel and listening to oral argument, I deny Defendants' motions except for First Boston's motion for summary judgment against KSC on its claims for breach of fiduciary duty and constructive fraud, which I grant.

### I. *Facts*

Kaiser filed its voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code on February 11, 1987, initiating the *Jacobs* action shortly thereafter. In that lawsuit, Kaiser claimed that a group of Kaiser shareholders gained control over Kaiser's board of directors during the months preceding the LBO, extracting from Kaiser a $14.5 million payment in exchange for the group's consent to the LBO (the "Option Payment").

KSC was created in 1989 to pursue all claims that Kaiser had asserted or could assert as a Chapter 11 debtor-in-possession against third parties. In 1989, KSC initiated the action against First Boston, an investment banking firm that served as Kaiser's financial advisor from Kaiser's incorporation in 1941 through the 1984 LBO. KSC claims that First Boston breached its fiduciary duties and acted negligently and fraudulently in advising Kaiser to proceed with the LBO, and that it is liable for aiding and abetting a breach of fiduciary duty by Kaiser's board of directors.

In 1990, KSC initiated the action against Touche Ross, its outside certified public accountant before, during, and after the LBO. KSC claims that Touche Ross breached its fiduciary duties and acted negligently and fraudulently in performing its accounting duties and in advising Kaiser that it was solvent at the time of the LBO and that it could meet its financial obligations after the LBO.

### II. *The Motions for Summary Judgment*

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In ruling on Defendants motions, I must accept as true all of

---

1. *KSC Recovery, Inc. v. First Boston Corporation, et al.,* No. 89–K–1178 (Bankr.D.Colo.1989).

2. *KSC Recovery, Inc. v. Jacobs,* No. 89–K–1721 (Bankr.D.Colo.1989).

3. *KSC Recovery, Inc. v. Touche Ross & Co.,* 90–K–1907 (Bankr.D.Colo.1990).

the evidence presented by KSC as the non-movant, and draw all justifiable inferences in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Summary judgment is only appropriate where the record, taken as a whole, could lead no rational trier of fact to find for KSC. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### A. *The Jacobs Defendants' Motion for Summary Judgment*

KSC asserts three types of claims against the Jacobs defendants:

1. A claim that Jacobs aided and abetted breaches of fiduciary duty by Kaiser's officers and directors by "formulating, recommending, and approving the Option Agreement." Pretrial Order at 38.

2. Claims for breach of fiduciary duty and constructive fraud based on Jacobs's conduct in forcing Kaiser to enter into the Option Agreement, delaying the LBO's closing for its own gain, using inside information to gain a profit for itself, and failing to disclose material facts indicating that Kaiser was insolvent or would be rendered insolvent by the LBO. *Id.* at 28–29, 39–40.

3. Fraudulent conveyance and restitution claims to recover the $14.5 million Option Payment and related profits on grounds that Kaiser was insolvent at the time the payment was made or was rendered insolvent by it and that Kaiser did not receive fair consideration for it.

Jacobs seeks summary judgment on each of these claims. Jacobs argues (1) that KSC cannot establish that the Kaiser board breached its fiduciary duties and even if it could, there is no evidence that Jacobs knowingly participated in such a breach; (2) as a minority shareholder engaged in arms-length negotiations with Kaiser, it owed no fiduciary duty to the corporation as a matter of law; and (3) that the Option Payment was a "settlement payment" within the meaning of § 546(e) of the Bankruptcy Code and is thus exempt from KSC's avoidance powers, and that KSC's fraudulent conveyance claims are barred by California's three-year statute of limitations.

Jacobs asserts that all of KSC's claims are precluded by operation of the judgment reduction provisions of the settlement agreement entered as an Order of the Court in *Kaiser Steel Resources, Inc. v. Charles H. Black, et al.*, No. 88–Z–1874. *See* Mem. Br.Supp. Jacobs Defs.' Mot.Summ.J. at 30.

Jacobs also joins in the solvency, causation, and damages sections of First Boston's Motion for Summary Judgment, as well as Touche Ross's Motion for Summary Judgment on damages. These motions, discussed *infra*, assert that KSC cannot establish certain requisite elements of its claims.

### *Merits*

#### 1. *The Black settlement agreement judgment reduction provisions*

■ The Jacobs defendants assert that the judgment reduction provisions negotiated as part of Kaiser's settlement with twelve former officers and directors (the "Black" defendants) entitle them to summary judgment. Mem.Br.Supp. Jacobs Defs.' Mot.Summ.J. at 30–36.[4] Jacobs argues that each of KSC's claims against it is subsumed in claims originally asserted against the Black defendants so that any finding of liability against Jacobs would require a simultaneous finding of 100% liability against the Black defendants. *Id.* at 32–36. Jacobs concludes that the Black reduction provisions preclude entry of judgment against it because any judgment obtained by KSC would have to be reduced by the Black defendants' 100% liability. *Id.* at 32.

---

**4.** The judgment reduction provisions provide, in pertinent part, that any judgment obtained by KSC against Kaiser shareholders or advisors be reduced by the $17 million received in settlement from the Kaiser officers and directors, and the larger of "(i) the fraction, portion or percentage, if any, of such judgment for which the directors and officers would have been liable to Kaiser or (ii) the amount which the person against whom the judgment has been obtained might otherwise be entitled to recover from the directors and officers by way of contribution, indemnification, or otherwise." *See* App. K. Mem.Br.Supp. Jacobs M.Summ.J. at 6, ¶ 3.

Jacobs's analysis is circular and conflicts with the express terms of the Black Order. The Black Order does not contemplate the use of its judgment reduction provisions to bar claims against non-settling parties. To the contrary, it deems the provisions "affirmative defenses" that "shall be tried" on their "merits" as part of the trial of the claims asserted in the consolidated proceedings. App. K to Mem.Br.Supp. Jacobs Mot. Summ.J. at 8, ¶¶ 3–5. The Order expressly adopts a "comparative liability" scheme that protects non-settling parties' *post-judgment* rights to contribution or indemnification. *Id.* at ¶ 4. On their face, the Black judgment reduction provisions provide no basis for the entry of summary judgment in favor of Jacobs on KSC's claims.

### 2. *KSC's Aiding and Abetting Claim*

■ The elements of a claim for aiding and abetting a breach of fiduciary duty are: (1) the existence of a fiduciary duty; (2) a breach of the fiduciary's duty; and (3) a knowing or active participation in that breach by the non-fiduciary defendants. Jacobs concedes the first element, but argues there is insufficient evidence to support a finding that Kaiser's board of directors breached its fiduciary duty, or that Jacobs "knowingly or actively" participated in that breach. Mem. Br.Supp. Jacobs Mot.Summ.J. at 7.

■ Jacobs contends that Kaiser's board cannot be found to have breached its fiduciary duty because its conduct was protected by the business judgment rule ("BJR"). KSC counters that the applicability of the BJR is a question of fact, and that the record supports a finding that Kaiser's board acted out of self interest in approving the Option Agreement. Resp. KSC in Opp.Mot.Summ.J. at 11–12, *citing Shivers v. Amerco*, 670 F.2d 826, 833 (9th Cir.1982) (where evidence of self-dealing has been presented, applicability of the BJR is "simply not amenable to resolution on a motion for summary judgment"); *Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 131 (Del. Ch. 1986) (whether defendants

breached fiduciary duties are questions that "must be resolved at trial"). Resp. at 11–12.

Given the entry of judgment against certain officers and directors of Kaiser in the course of reaching a settlement of the *Black* action, I question the applicability of the BJR to KSC's aiding and abetting claim here. To the extent it is applicable, however, I conclude that the BJR raises questions of material fact precluding entry of summary judgment.[5]

■ Jacobs next argues that its arms-length dealings with the board precludes any finding that it "knowingly or actively" participated in that breach as a matter of law. Mem.Br.Supp.Mot.Summ.J. at 8–10, Reply at 11–12. Though enticing, this argument is ultimately fact driven because it presupposes that the Kaiser–Jacobs negotiations were, in fact, arms-length.

Jacobs relies on *In re Wheelabrator Technologies, Inc. Shareholders Litigation*, 1992 WL 212595 (Del.Ch.1992) and *Tomczak v. Morton Thiokol, Inc.*, Fed.Sec.L.Rep. ¶ 95,-327, 1990 WL 42607 (Del.Ch.1990) to support its argument. In *Wheelabrator*, a 22% shareholder that designated 4 of 11 board members sought control of the corporation. Plaintiff asserted that the shareholder "dictated" terms to a self-dealing board after having threatened to dispose of its 22% share of the stock if its terms were not met.

The Delaware Chancery Court dismissed plaintiff's aiding and abetting claims, stating that

> These allegations, if true, lead to an inference of hard bargaining on the part of Waste [the 22% shareholder]—conduct in which Waste had every right to engage— not of complicity in whatever breaches of duty Waste's board may have committed. 'Knowing participation' requires more.

*Wheelabrator*, 1992 WL 212595, at *9–10.

In *Tomczak*, Dow Chemical Company ("Dow") purchased 8.3% of Morton Thiokol ("Thiokol") common stock, notifying Thiokol in its SEC filings that Dow might seek to acquire or control Thiokol. 1990 WL 42607

---

**5.** Judge Weinshienk reached this same conclusion at the February 16, 1993, hearing on Jacobs's Motion to Dismiss KSC's claims. *See* Re-

porter's Tr. at 44:17–21 (denying summary judgment on KSC's Seventh Claim for aiding and abetting breach of fiduciary duty).

at *2. Fearing a creeping tender offer, Thiokol's board negotiated and approved a deal with Dow where Dow acquired a division of Thiokol and $131 million in exchange for its shares of Thiokol stock. *Id.* at *5. Thiokol's shareholders sued, claiming that Dow aided and abetted a breach of fiduciary duty by participating in the deal.

In granting Dow's motion for summary judgment, the court held that Dow's purchases of stock and exertion of economic pressure on Thiokol occurred in the context of arms-length negotiations and did not constitute "knowing participation" in any breach of fiduciary duty by the board as a matter of law. *Id.* at *16.

Neither *Wheelabrator* nor *Tomczak* is dispositive of Jacobs's motion, however. In *Wheelabrator,* the court explicitly noted that the directors designated by Waste had not participated in the control contest and that plaintiff had not alleged that the board "was in some fashion controlled" by Waste. *Wheelabrator,* 1992 WL 212595 at *9. Similarly, the *Tomczak* court noted that Dow's 8.23% holdings in Thiokol before the disputed transaction "did not approach the threshold of control" of Thiokol that would give rise to a fiduciary duty and render Dow's conduct wrongful. 1990 WL 42607 at *16. In the present case, by contrast, allegations that Jacobs's 23% interest controlled the Kaiser board form the crux of KSC's claims and preclude entry of summary judgment.

### 3. *KSC's Breach of Fiduciary Duty Claim*

KSC alleges that Jacobs's status as a controlling shareholder and its confidential relationship with Kaiser gave rise to fiduciary duties, which Jacobs breached. Pretrial Order at 39. Jacobs disagrees, asserting that it owed Kaiser no fiduciary duty as a matter of law. Mem.Br.Supp.Jacobs Mot.Summ.J. at 10, Reply at 2.

#### a. *Existence of a confidential relationship*

■ KSC contends that the written Confidentiality Agreement executed by Jacobs created a fiduciary relationship with incumbent fiduciary duties, citing *In re S & D Foods, Inc.,* 144 B.R. 121 (Bkrtcy.D.Colo. 1992). *S & D Foods* does not support KSC's

position. In that case, the parties executed a confidentiality agreement as part of negotiations to form a partnership. *Id.* at 162. It was because the parties were deemed to be joint venturers that fiduciary duties arose, not because they had signed a confidentiality agreement.

KSC also argues that Jacobs's access to confidential financial records and other "special facts" about Kaiser made it an insider with incumbent fiduciary duties. Resp. at 9–10. This argument, too, is specious. The fiduciary duties under the caselaw cited by KSC arose because one party was heavily dependent upon the judgment or advice of another. *E.g. Stokes v. Henson,* 217 Cal. App.3d 187, 265 Cal.Rptr. 836, 840 (4th Dist. 1990) (defendant was investment advisor, trustee of the commodities accounts at issue, and securities broker-dealer). Fiduciary duties arise under the California jury instruction cited by KSC only where one party knows of material facts and also knows that such facts are neither known nor "readily accessible" to the other party. B.A.J.I. 12.-36. In the present case, all "inside information" was provided to Jacobs by Kaiser itself. I conclude, therefore, that neither the Confidentiality Agreement nor Jacobs's access to Kaiser's financial information gave rise to a confidential relationship or by themselves created fiduciary duties between Jacobs and Kaiser.

#### b. *Jacobs's status as a controlling shareholder*

■ The parties agree that a minority shareholder may owe fiduciary duties to a corporation and its creditors if it dominates or controls the corporation's board. Jacobs asserts that KSC has failed to allege facts sufficient to establish domination and control as a matter of law.

KSC asserts that the question of control is always one of fact precluding summary judgment. KSC Response at 8, *citing Heckmann v. Ahmanson,* 168 Cal.App.3d 119, 214 Cal.Rptr. 177, 187 n. 7 (1985) (question of control depends on the amount of influence minority shareholder can exert on the corporation by reason of its holdings"); *Traub v. Barber,* 86 A.D.2d 806, 452 N.Y.S.2d 575, 576

(1982) (question of fact whether 20.6% shareholder had controlling interest); *In re Lee Way Holding Co.,* 105 B.R. 404, 412–13 (Bkrtcy.S.D.Ohio 1989) (question of fact whether 35% shareholder can exert sufficient influence to owe fiduciary duties). KSC claims Jacobs's "substantial holdings of Kaiser stock" allowed it to control Kaiser's board of directors and "force" the board to enter into the Option Agreement. Pretrial Order at 39.

Jacobs argues that a shareholder's voting power alone does not give rise to a fiduciary duty as a matter of law. Mem.Br.Supp.Jacobs Mot.Summ.J. at 13, *citing Zahn v. Transamerica Corp.,* 162 F.2d 36, 45 (3d Cir.1947). Fiduciary duties attach only where a shareholder steps out of his role as a shareholder and usurps the functions of a director in managing corporate affairs. *Id.* at 12–13, *citing Harriman v. E.I. DuPont de Nemours & Co.,* 372 F.Supp. 101, 105–06 (D.Del.1974) (absent a showing that a transaction was "engineered in a unilateral fashion by a dominant party," it will not give rise to a fiduciary duty).

■■■■ Jacobs's argument is a sound one. A shareholder's leverage or influence in the bargaining process of a contested merger has been held to be insufficient, without more, to give rise to a fiduciary duty to the corporation or its creditors. *See Fry v. Trump,* 681 F.Supp. 252, 256 (D.N.J.1988) (dismissing plaintiff's breach of fiduciary duty claim against a 10% shareholder that lost a battle for control but received "greenmail"); *In re Sea–Land Corporation Shareholders Litigation,* Fed.Sec.L.Rep. ¶ 93,923, 1988 WL 49126 (Del.Ch.1988) (dismissing plaintiff's breach of fiduciary duty claim against a 39.5% shareholder that had received option money not paid to other shareholders). *See also Tomczak, supra,* 1990 WL 42607 (no fiduciary duty as a matter of law where defendants pursued their own interests through arms-length negotiations with a board); *Wheelabrator, supra,* 1992 WL 212595 (same). Jacobs correctly points out

the circular nature of KSC's argument: KSC cannot *create* a fiduciary duty by pointing to conduct that would be wrongful only if Jacobs *owed* Kaiser a fiduciary duty, i.e., placing its own financial interests above those of the company and accepting a premium for its stock not given other shareholders.

Nevertheless, Jacobs is not entitled to summary judgment. KSC alleges that by August of 1983, Kaiser's CEO was seeking approval of Irwin Jacobs with respect to the "day to day managerial decisions of Kaiser," and that the Jacobs Group unilaterally dictated the terms of the Option Agreement and "forced" Kaiser into approving it. KSC Resp. at 3–4. KSC also alleges that Jacobs's 23% ownership of Kaiser's stock, in combination with Kaiser's history of 28–32 percent non-voting shares, was actually a controlling interest. *Id.* at 4. These contentions, if true, would distinguish this case from *Tomczak, Wheelabrator,* and *Sea–Land,* and they are for the jury to decide.[6]

### 4. KSC's Fraudulent Conveyance Claims

#### a. Operation of 11 U.S.C. § 546(e)

KSC alleges that the October 1983 Option Payment to the Jacobs defendants was a fraudulent conveyance voidable under California law and the "strong-arm" clause of 11 U.S.C. § 544(b). *See* Plaintiff's Fourth Amended Complaint. KSC seeks recovery of the $14.5 million Option Payment and related profits. Pretrial Order 28–30. Jacobs moves for summary judgment on these claims, asserting that the $14.5 million was a "settlement payment" made "by or to" a stockbroker under § 546(e) of the Bankruptcy Code and that it is therefore exempt from KSC's avoidance powers. Mem.Br.Supp.Jacobs Mot.Summ.J. at 20–23.

KSC's response is twofold. KSC argues that Judge Weinshienk's previous denial of the same Jacobs motion constitutes the law of the case, and should not be reconsidered. KSC Resp. at 13–14. In the alternative, KSC argued at the motions hearing that the question of whether the $14.5 million was a

---

6. My decision to allow KSC's breach of fiduciary duty claim to proceed to trial effectively disposes of Jacobs's summary judgment arguments regarding KSC's unjust enrichment and constructive fraud claims, which were premised on KSC's inability to establish that Jacobs owed Kaiser a fiduciary duty.

"settlement payment" turns on whether the agreement pursuant to which it was paid (the Option Agreement) was a "securities contract." According to KSC, the nature of the Option Agreement is a question of fact precluding summary judgment.

### (1) *"Law of the Case"*

 KSC's "law of the case" argument is not determinative. While I indeed may refuse to entertain Jacobs's second motion for summary judgment, I am not bound to do so. *See Lindsey v. Dayton–Hudson Corp.*, 592 F.2d 1118, 1121 (10th Cir.1979). A second motion for summary judgment may be proper after a previous motion is dismissed, if supported by new material. *Id.* (citing 6 Moore's Federal Practice ¶ 56.14[2], pp. 56–363 to 56–366 (2d ed. Supp.1976)). While arguably lacking new material, Jacobs's second motion for summary judgment was filed at the close of discovery and rests upon a significantly expanded record in this case. Because the district court always retains jurisdiction to modify or rescind a prior interlocutory order, Fed.R.Civ.P. 54(b), I am free to consider Jacobs's argument on its merits. I do so to put the matter at rest for the trial.

### (2) *Was the $14.5 million a "settlement payment?"*

 Section 546(e) prohibits a trustee or debtor-in-possession from avoiding a transfer that is a

> margin payment, as defined in section 741(5) or 761(15) of this title, or a settlement payment, as defined in section 741(8) of this title, made by or to a commodity broker, forward contract merchant, stockbroker, financial institution or securities clearing agency, that is made before the commencement of the case.

Section 741(8) defines a "settlement payment" as a

> preliminary settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade.

The question of what constitutes a "settlement payment" under these provisions has already been the subject of considerable analysis by this court and the Tenth Circuit Court of Appeals in this protracted bankruptcy litigation. In *Kaiser Steel Corp. v. Charles Schwab & Co. (In re Kaiser Steel Corp.)*, 913 F.2d 846, 850 (10th Cir.1990), the Tenth Circuit affirmed my ruling in *Kaiser Steel Resources, Inc. v. Jacobs*, 110 B.R. 514 (D.Colo.1990), that money and preferred stock transferred to a broker during the consummation of an LBO is a "settlement payment" under § 546(e). In *Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.)*, 952 F.2d 1230, 1240 (10th Cir. 1991), the Tenth Circuit extended the *Schwab* definition of "settlement payment" to include money and preferred stock transferred directly to equity shareholders (in that case, the Jacobs Group) during the consummation of an LBO.

Jacobs now asks that I extend the definition of "settlement payment" still further to include, as a matter of law, money paid to equity shareholders *before* a *proposed* LBO in exchange for (1) an irrevocable proxy to vote their stock in favor of the LBO; and (2) an option to purchase shares of preferred stock that Jacobs would receive only if the LBO were consummated. On the record before me, I decline to do so.

Congress defines "settlement payment" in the Bankruptcy Code by reference to the way that term is "commonly used in the securities trade." *See* 11 U.S.C. § 741(8). In the securities trade, settlement is " 'the completion of a securities transaction.' " *Schwab, supra*, 913 F.2d at 849 (quoting A. Pessin & J. Ross, *Words of Wall Street: 200 Investment Terms Defined*, p. 279 (1981)); *In re Comark*, 971 F.2d 322, 325 (9th Cir. 1992) (citing *Schwab* ).

The Tenth Circuit has identified four types of securities transactions that involve "settlement payments" of one form or another. These include the "securities contract" (*see* 11 U.S.C. § 741(7)); the "repurchase agreement" (*see* § 101(47)); the "commodity contract" (*see* 11 U.S.C. § 761(4)); and the "forward contract" (*see* 11 U.S.C. § 101(25)). *Pearl Brewing, supra*, 952 F.2d at 1239, n. 9. Jacobs argues that because the Option Agreement was "an option for the purchase

or sale of a security" within the definition of § 741(7), the $14.5 million option payment "completed a securities transaction" and is thus a "settlement payment" exempt from avoidance. Jacobs Opening Brief at 24. I presently am unconvinced that interpreting "settlement payment" to include the $14.5 million option payment at issue would be consistent with the way that term is commonly used in the securities industry.[7]

The option payment was consideration for the Jacobs defendants' acquiescence in the Frates merger. See Pretrial Order at 54 (Jacobs states that the option payment purchased an "irrevocable proxy to vote all of the Jacobs stock" in favor of the Frates merger, as well as the Jacobs Group's "agreement not to purchase more [Kaiser] stock"). The preferred stock "optioned" did not even exist at the time the option payment was received; it would only be issued and the option arise if the merger went through.

■ I conclude that while the definition of "settlement payment" is broad, it is not boundless. The fact that the Option Agreement may arguably fall within the definition of "securities contract" in 11 U.S.C. § 741(7) does not mean that Congress intended to shield the option payment at issue from avoidance under § 546(e).

Congress enacted the precursor to § 546 in 1978 to "'protect the nation's financial markets from the instability caused by the reversal of settled securities transactions.'" Schwab, 913 F.2d at 848 (quoting Jacobs, 110 B.R. at 522). That provision, 11 U.S.C. § 764(c) (repealed 1982), initially applied only to the commodities market, protecting margin payments to brokers and settlement payments from clearing organizations. Id. at 848–49 (citations omitted). In 1982, "con-

cerned about the volatile nature of the commodities and securities markets," Congress replaced § 764(c) with §§ 546(e) and 741(5), (8) "'to clarify and, in some instances, broaden the commodities market protections and expressly extend similar protections to the securities market.'" Id. (citing H.R.Rep. No. 420, 97th Cong., 2d Sess. at 2 (1982), reprinted in 1982 U.S.Code Cong. & Admin.News 583). Again, the purpose was "'to minimize the displacement caused in the[se] markets in the event of a major bankruptcy affecting those industries.'" Id. (citing H.R.Rep. No. 420 at 1, reprinted in 1982 U.S.Code Cong. & Admin.News at 583).

An avoidance of the option payment in the present case would neither displace nor destabilize the securities market. Cf. Schwab, 913 F.2d at 849 (the avoidance of an LBO, like the avoidance of a routine stock sale, would have a disruptive "ripple effect" on the market); Pearl Brewing, 952 F.2d at 1241 (disruption in the securities industry would be the inevitable result if LBO's could be freely unwound years after they occurred). The only transaction involving the Jacobs preferred stock that actually affected the securities market was when Drexel Burnham purchased the stock in April of 1984.[8] That purchase, and the related transfer of stock and money, was wholly separate from the option payment at issue. An avoidance of the option payment would have no effect on that securities transaction or on the proceeds Jacobs earned from it.

Absent evidence or authority that consideration exchanged for the right to purchase preferred stock that may or may not issue at a future date is a "settlement" as that term is commonly used in the securities industry, I deny Jacobs motion for summary judgment.[9]

---

7. I note that in Pearl Brewing and in Schwab, the Tenth Circuit was aided on this issue by briefs filed by the Securities and Exchange Commission ("SEC"). See Pearl Brewing, 952 F.2d at 1235; Schwab, 913 F.2d at 849–50. In those briefs, the SEC took the position that the consummation of an LBO is a "settlement payment" as that term is commonly used in the securities industry. I have no such guidance here.

8. Kaiser sold the Jacobs option to Drexel in April, 1984, for $250,000.

9. Jacobs argues that the determination of whether a particular payment is a "settlement payment" within the meaning of § 546(e) is a question of law not subject to factual dispute, relying on In re Comark, 971 F.2d at 324. Opening Brief at 22–23. This argument is circular and overreaching. What the Ninth Circuit said on page 324 of its opinion was that the meaning of "settlement payment" is a question of statutory construction, citing, inter alia, Pearl Brewing. Not only did the Ninth Circuit rely on "undisputed facts" in determining that the return of government securities in a repurchase or "repo" trans-

### b. *Effect of the California statute of limitations*

Jacobs argues that KSC's claims under the California Uniform Fraudulent Conveyance Act ("UFCA") to set aside the option payment is time barred by California's three-year statute of limitations. Cal.Civ.Proc. Code § 338.[10] Opening brief at 25. Because the option payment was made on January 18, 1984, Jacobs asserts that KSC's action—or at least its petition in bankruptcy—had to have been commenced by January 17, 1987. Opening Brief at 25. KSC filed its Chapter 11 reorganization petition on February 11, 1987, and its initial complaint against Jacobs on February 27, 1987.

KSC responds that the state statute of limitations does not apply because government creditors filed claims in Kaiser's bankruptcy proceedings, and state statutes of limitations do not operate against such creditors. Response at 16, *citing United States v. Gleneagles Inv. Co.,* 565 F.Supp. 556, 583 (M.D.Pa.1983), *aff'd sub nom. United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3d Cir.1986), *cert. denied sub nom. McClellan Realty Co. v. United States,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987); *In re Hunt,* 136 B.R. 437, 450–51 (Bkrtcy. N.D.Tex.1991). KSC concludes that because the option payment remains voidable by governmental creditors under state law, it is voidable by KSC in bankruptcy. *Id., citing* 11 U.S.C. § 544(b).

Jacobs disputes the applicability of the governmental immunity exception where, as here, the governmental creditors act solely in a proprietary function for the profit or benefit of the governmental unit. Reply at 20, *citing People v. Chambers,* 37 Cal.2d 552, 233 P.2d 557, 561 (1951). Jacobs argues that the *Gleneagles* and *Hunt* cases are distinguishable, and that the exception should be construed narrowly as a matter of public policy.

Reply at 20–21. Because I am not satisfied that the three-year statute of limitations has run against KSC in the first instance, I deny Jacobs's motion without reaching the governmental immunity issue.

By operation of § 544(b) of the Bankruptcy Code, KSC stands in the shoes of all unsecured creditors to avoid any of Kaiser's transfers that would be voidable by a creditor under state law. 4 *Collier on Bankruptcy* ¶ 544.03, p. 544–15 to 21 (15th ed. 1993). The question here, then, is whether KSC's fraudulent conveyance claims would be time-barred had they been asserted by a creditor on February 11, 1984, the date Kaiser's Chapter 11 petition was filed.[11]

■ While KSC does not raise the argument, I find that the discovery rule applies to KSC's claims under the UFCA for fraudulent conveyance. *See* Cal.Civ.Proc.Code § 338(4) (an action for relief on the ground of fraud or mistake "is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake"); *In re Mankin,* 823 F.2d 1296, 1299 n. 1 (9th Cir.1987) (actions to set aside fraudulent conveyances brought pursuant to California law under § 544(b) are subject to the three year limitations period of § 338(4)). In bankruptcy, a trustee's fraudulent conveyance action will be deemed to have accrued when the aggrieved creditor discovered the facts constituting the fraud against which relief was sought. *First Presbyterian Church of Santa Barbara v. Rabbitt,* 118 F.2d 732, 735 (9th Cir.1941).

■ The facts alleged by KSC as establishing the fraudulent nature of the option payment include that Kaiser was insolvent at the time the option payment was made and that Kaiser accepted inadequate consideration for the option payment. Fourth Amended Complaint at ¶¶ 38, 41–42. KSC

---

action constituted a "settlement payment," the case upon which it relied expressly states that the term "must" be interpreted "as it is plainly understood within the securities industry." *Pearl Brewing,* 952 F.2d at 1237.

**10.** Section 338 of the California Civil Procedure Code provides for a three-year filing period to bring actions asserting liability created by state

statute (§ 338(1)) or actions for relief on the grounds of fraud or mistake (§ 338(4)).

**11.** If the claims had not been barred as of the petition date, then § 546(a) of the Bankruptcy Code would supersede the state statute of limitations period because it specifies the time within which a § 544 claim can be brought. *Collier, supra,* ¶ 544.03[2] at 544–21 to 544–22.

asserts that some Kaiser creditors were unaware of these facts until after March of 1984. Fourth Amended Complaint at ¶ 18. If this were true, then KSC's fraudulent conveyance claims filed in February of 1987 would not be time barred under § 338.

The question of when Kaiser creditors discovered or should have discovered the alleged fraudulent nature of the option payment is one of fact precluding entry of summary judgment.

**B. First Boston's Motion for Summary Judgment**

KSC asserts three types of claims against its long-time investment banker and financial advisor First Boston:

1. Claims for breach of fiduciary duty, negligence and gross negligence, fraud and deceit, constructive fraud, and breach of contract based on (a) First Boston's opinion letters advising Kaiser that the merger agreement/LBO was fair; and (b) First Boston's alleged advice that Kaiser would be able to pay its debts and obligations after the LBO (collectively, the "Malpractice Claims"). Pretrial Order at 30–36.

2. A claim for aiding and abetting an alleged breach of fiduciary duty by Kaiser's board of directors in approving the Jacobs option payment. *Id.* at 36–37.

3. A fraudulent conveyance claim to recover the professional fees Kaiser paid to First Boston in connection with the LBO. *Id.* at 28–29.

First Boston argues that (1) it is entitled to summary judgment on all claims because Kaiser was neither insolvent at the time of the LBO nor rendered insolvent by it, and because KSC cannot satisfy two elements of all its claims, namely, causation and damages; (2) First Boston is entitled to summary judgment on the Malpractice Claims because KSC concedes the accuracy of the Fairness Opinion and cannot prove that its reliance on the Fairness Opinion was justifiable; (3) First Boston owed no fiduciary duty to Kaiser as a matter of law thereby entitling it to summary judgment on KSC's breach of fiduciary duty and constructive fraud claims; (4)

First Boston is entitled to summary judgment on KSC's aiding and abetting claim because KSC cannot establish that Kaiser's board breached its fiduciary duties or that First Boston participated in any breach if one occurred; and (5) a claim for the return of a professional fee is not legally cognizable as a fraudulent conveyance claim and KSC's claim is barred by the statute of limitations in § 546(a) of the Bankruptcy Code.

*Merits*

**1. Sufficiency of the Record Regarding Solvency, Causation, and Damages**

**a. The Solvency Issue**

First Boston asserts that all of KSC's claims rest on the allegation that Kaiser was either insolvent at the time of the LBO or rendered insolvent by the LBO. First Boston claims entitlement to summary judgment on all claims because there is no disputed issue of fact that Kaiser was solvent before, during, and after the LBO. Mem. Supp. First Boston's Mot.Summ.J. at 15–22. KSC, of course, disagrees.

Between them, the parties rely on the deposition testimony or conclusions of at least four experts and seven witnesses to support their respective positions regarding Kaiser's solvency or insolvency. On the record before me, I am unwilling and unable to conclude that the evidence relating to Kaiser's solvency before and after the LBO is one capable of only one rational inference. The question of Kaiser's solvency is one which the jury must decide.

**b. The Adequacy of KSC's Evidence on Causation and Damages**

KSC alleges that First Boston's conduct was a substantial factor in causing the LBO to occur, and seeks judgment against First Boston for damages consisting of the $218 million in "cash outflows" lost in the LBO. Pretrial Order at 37. First Boston argues that KSC is attempting to recover indirectly that which it cannot recover directly under a fraudulent conveyance theory, namely, recover from First Boston payments made to third parties, citing *Liebmann v. Pucci (In re Ampat)*, 128 B.R. 405, 411 (Bankr.D.Md.1991).

Touche Ross filed a separate motion for summary judgment on this same issue, which I address *infra* at Section II(D). In the interest of brevity, I incorporate by reference here the discussion in Section II(D), and deny First Boston's motion for summary judgment.

The only additional argument raised by First Boston is that KSC cannot recover payments made to its shareholders in the LBO because these payments benefitted, rather than harmed, its shareholders. First Boston relies on *Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Company*, 417 U.S. 703, 715, 94 S.Ct. 2578, 2585, 41 L.Ed.2d 418 (1974), for the proposition that Kaiser could have suffered no legally cognizable injury because its shareholders suffered no legally cognizable injury. Mem. Supp. First Boston's Mot.Summ.J. at 27. *Bangor Punta*, which did not involve bankruptcy proceedings and relied on principles of unjust enrichment to prevent a corporation from asserting mismanagement claims against the former owners of a majority of its stock, is inapposite and does not support First Boston's proposition.

### 2. *The Malpractice Claims*

■ First Boston claims it is entitled to summary judgment on KSC's Malpractice Claims because (1) KSC's banking expert William Cockrum has conceded the accuracy of First Boston's opinion that the LBO was fair to the common stockholders of Kaiser; and (2) KSC cannot prove justifiable reliance. Mem.Supp. First Boston's Mot.Summ.J. at 8–15. KSC counters that the Cockrum testimony cited by First Boston is not dispositive, and that justifiable reliance is not an element of a professional malpractice action brought by a *client* against an advisor, as opposed to a third party. Resp. KSC Opp. First Boston's Mot.Summ.J. at 4–9 (citing *Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 11 Cal. Rptr.2d 51, 834 P.2d 745, 767 (1992)). I agree.

KSC disputes the significance of Mr. Cockrum's "concession" given the broader nature of KSC's claims and the fact that Mr. Cockrum later testified that the fairness opinion was accurate "other than the fact that it [was

given] in the context of an LBO which takes substantial cash out of the business, which is a whole different subject." *Id.* at 4, n. 3. KSC asserts that its claims do not turn on the accuracy of the conclusion that Kaiser's stockholders received fair consideration for their stock, but rather on First Boston's implicit conclusion that Kaiser was solvent before the LBO. *Id.* at 5.

Mr. Cockrum's deposition testimony is not dispositive of KSC's Malpractice Claims. First Boston was Kaiser's financial advisor from its incorporation in 1941 through the LBO. During the course of the pre-merger events at issue, the record reveals at least seven fairness opinions authored by First Boston which, taken as a whole, may corroborate KSC's allegations that First Boston encouraged Kaiser to go forward with the LBO when otherwise it might not have. Because I have already concluded that sufficient evidence exists from which a rational trier of fact could infer Kaiser's insolvency before the LBO, First Boston is not entitled to summary judgment.

### 3. *The Breach of Fiduciary Duty and Constructive Fraud Claims*

■ KSC claims that, "because of [First Boston's] long-standing position as financial advisor to Kaiser, the lengthy relationship of trust and confidence between Kaiser and First Boston, and First Boston's access to material and confidential information concerning Kaiser's financial condition and operation, First Boston owed Kaiser fiduciary duties." Pretrial Order at 30. First Boston argues that these allegations, even if true, are insufficient as a matter of law to establish a fiduciary relationship. Mem.Supp. First Boston's Mot.Summ.J. at 28–32. KSC responds that the existence of a fiduciary or confidential relationship is necessarily a question of fact for the jury. Resp. KSC Opp.Mot.Summ.J. at 14–15.

The dispute between the parties on summary judgment turns on the applicability and interpretation of *Kenney v. Bear Stearns & Co. (In re Daisy Systems Corp.)*, Fed.Sec. L.Rptr. ¶ 97,729, 1993 WL 491309 (N.D.Cal. 1993). First Boston contends *Daisy* is dispositive; KSC that it "misapplies" California

law and that, in any event, it is distinguishable. I agree with First Boston, and enter summary judgment against KSC on its claims for breach of fiduciary duty and constructive fraud.

*Daisy,* a Chapter 11 bankruptcy proceeding arising out of a failed LBO attempt, is directly on point. In that case, the trustee initiated an action against the debtor's financial advisor Bear Stearns, alleging that Bear Stearns breached its fiduciary duty, engaged in professional malpractice, and breached an implied covenant of good faith and fair dealing when it analyzed the LBO and concluded that it could be successfully structured from a financial point of view. Fed.Sec.L.Rptr. at ¶ 97,446. Finding that no fiduciary relationship can exist without superiority on the part of the defendant, the court dismissed the trustee's breach of fiduciary duty claim against Bear Stearns. *Id.* at ¶ 97,447–48 (citing *Rubin v. Posner,* 701 F.Supp. 1041 (D.Del.1988)).

The *Daisy* court concluded that in California, like Delaware, the basis for a fiduciary relationship is "that the parties do not deal on equal terms, because 'the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert undue influence over the dependent party.'" *Id.* at ¶ 97,447 (quoting *Beery v. State Bar,* 43 Cal.3d 802, 813, 239 Cal.Rptr. 121, 739 P.2d 1289 (1987)). The mere fact that an investment bank "was hired as an expert consultant to render financial services does not mean it was in a position of superiority in [a] relationship between two sophisticated business entities." *Id.* at ¶ 97,448.

The cases cited by KSC in support of its assertion that *Daisy* "misapplies California law" are unpersuasive. Most of those cases involve an investment advisor counseling an individual in connection with a specific investment decision, *e.g., Twomey v. Mitchum, Jones & Templeton, Inc.,* 262 Cal.App.2d 690, 69 Cal.Rptr. 222, 236 (1968), and one concerns a lawyer who became sexually involved with his client. *Barbara A. v. John G.,* 145 Cal.App.3d 369, 193 Cal.Rptr. 422, 432 (1983).

The only case cited by KSC that deals with an investment bank is *Litton Indus., Inc. v.*

*Lehman Bros. Kuhn Loeb Inc.,* 767 F.Supp. 1220 (S.D.N.Y.1991). In *Litton,* the breach of fiduciary duty claim was brought by a successful tender offeror who alleged that the bank's disclosure of inside information artificially inflated the market price of the target company's stock. The court held that a genuine issue of fact existed as to whether the bank agreed to enter into a confidential relationship with its client before the tender offer. KSC alleges no breach of client confidences here, and *Litton* is therefore distinguishable.

■■ Alternatively, KSC argues that *Daisy* does not apply to this case because the relationship between First Boston and Kaiser was long-term while the relationship in *Daisy* was limited to advice in connection with the LBO. Resp. at 16. I disagree. The conclusion in *Daisy* turned on the nature, not the length, of the relationship between an investment bank and its client. Fed.Sec.L.Rptr. at ¶ 97,447–48. Where, as here, the relationship is between two sophisticated business entities, allegations that the company was "completely dependent on the expertise and superior knowledge of the [financial advisor]," even if true, are insufficient as a matter of law to give rise to fiduciary duties. *Id.* at ¶ 97,448.

Summary judgment is therefore granted First Boston on KSC's claims for breach of fiduciary duty and constructive fraud.

### 4. *The Aiding and Abetting Claim*

First Boston asserts it is entitled to summary judgment on KSC's aiding and abetting claim because KSC cannot prove (1) a breach of fiduciary duty by Kaiser's directors; or (2) First Boston's participation in any breach. Mem.Supp. First Boston Mot.Summ.J. at 32–39. First Boston supports its first assertion by invoking the business judgment rule on behalf of Kaiser's directors. I incorporate here my discussion in Section II(A)(2), *infra,* and conclude that First Boston's invocation of the business judgment rule raises questions of material fact precluding summary judgment.

■■ I also find that KSC has presented sufficient evidence regarding First Boston's

participation in negotiating, formulating, recommending, or approving the Jacobs Option Agreement to survive a motion for summary judgment on KSC's aiding and abetting claim, and deny First Boston's motion.

### 5. *The Fraudulent Conveyance Claim*

First Boston asserts that KSC's fraudulent conveyance claim fails as a matter of law because (1) professional fees cannot be recovered as a fraudulent conveyance; and (2) KSC's claim is barred by the statute of limitations under § 546(a) of the Bankruptcy Code. Mem.Supp. First Boston Mot. Summ.J. at 41–48.

#### a. *Recoverability of Professional Fees Under Fraudulent Conveyance Theory*

■ First Boston claims professional fees cannot be recovered as a fraudulent conveyance where the gist of the claim is services were negligent, citing, *inter alia, Oppenheimer–Palmieri Fund v. Peat Marwick Main & Co. (In re Crazy Eddie Sec. Litig.)*, 802 F.Supp. 804 (E.D.N.Y.1992). KSC responds that *Crazy Eddie* is expressly limited to New York debtor and creditor law, and that other courts permit the recovery of professional fees under a fraudulent conveyance theory in bankruptcy. KSC Resp.Opp. First Boston Mot.Summ.J. at 20 (citing *In re Chicago, Missouri & Western Ry. Co.*, 124 B.R. 769 (Bankr.N.D.Ill.1991)).

■ I agree. I find that genuine questions of material fact exist regarding the reasonability of First Boston's fee and the adequacy of the consideration Kaiser received in exchange for it, and that these factual issues preclude entry of summary judgment.

#### b. *Statute of Limitations*

■ First Boston's assertion that KSC's fraudulent conveyance claim is time barred has already been considered and rejected by Judge Weinshienk.[12] At a hearing on motions for summary judgment held January 13, 1993, Judge Weinshienk ruled that KSC's fraudulent conveyance claim against First Boston related back to the *Citron*[13] complaint and was not, therefore, time barred under § 546(a) of the Bankruptcy Code. Reporter's Transcript, Tab 26 to KSC's Combined App.Opp.Defs.' Mots.Summ.J. at 5:3–9.

In order to find in favor of First Boston on its statute of limitations argument, I would have to reverse Judge Weinshienk's ruling. This I will not do. *See* "Law of the Case," Section II(A)(4)(1), *supra.* In the absence of new material, I decline to reconsider Judge Weinshienk's ruling and deny First Boston's request for summary judgment on the fraudulent conveyance statute of limitations issue.

### C. Touche Ross's Motion for Summary Judgment (Statute of Limitations)

■ In this first of two separate motions for summary judgment filed by Touche Ross ("Touche"), Touche claims that KSC's malpractice claims are barred by California's two-year statute of limitations applicable to claims for professional negligence. I conclude that a rational trier of fact could find otherwise and deny the motion.

■ The parties agree that California law governs KSC's claims against Touche for professional negligence in this action.[14] California law establishes a two year statute of limitations for professional negligence claims. Cal.Civ.Pro.Code § 339(1) (Deering 1991). The timeliness of KSC's suit against Touche depends on when KSC's cause of action ac-

---

**12.** Before the *Jacobs, First Boston,* and *Touche* actions were transferred to me, they were presided over by the Hon. Zita Weinshienk of this Court.

**13.** The *Citron* action, *Citron, et al. v. Girard, et al.,* No. 89–Z–1178 (D.Colo.1989), involved six consolidated shareholder class actions alleging, *inter alia,* that Kaiser's directors breached their fiduciary duties in connection with the LBO. *Citron* was settled as part of the *Black* litigation in October of 1991.

**14.** Touche seeks summary judgment on all of KSC's causes of action based on the two year statute, asserting that the gravamen of each lies in negligence. Because I address only the statute of limitations applicable to claims for professional negligence, I do not reach the issue of whether the two year statute applies to KSC's other claims.

crued. The parties agree that this issue is resolved by reference to California's "discovery rule." This rule protects injured plaintiffs who are ignorant of their injuries from being barred by the common law rule that an action accrues on the date of injury. *See Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 245 Cal.Rptr. 658, 660, 751 P.2d 923, 926 (1988).

■ "The discovery rule provides that the accrual date of a cause of action is delayed until the plaintiff is aware of her injury and its negligent cause. A plaintiff is held to her actual knowledge as well as knowledge that could reasonably be discovered through investigation of sources open to her." *Id.* 245 Cal.Rptr. at 661, 751 P.2d at 926–27 (citations omitted). The uniform California rule is that a limitations period dependent on the discovery of a cause of action begins to run "no later than the time the plaintiff learns, or should have learned, the facts essential to his claim." *Gutierrez v. Mofid,* 39 Cal.3d 892, 218 Cal.Rptr. 313, 316, 705 P.2d 886, 889 (1985).

Touche relies on *Pleasant v. Celli,* 18 Cal. App.4th 841, 22 Cal.Rptr.2d 663 (1993), *review denied,* (Dec. 16, 1993), to argue that KSC's claims against Touche accrued no later that February 29, 1984, the date of the LBO. In *Pleasant,* the California Court of Appeals held that "[a] cause of action for legal malpractice [15] accrues when the client (a) discovers or should discover the facts essential to the malpractice claim, and (b) suffers appreciable and actual harm flowing from the attorney's negligent conduct." Touche argues that the CVRD litigation raised questions as to Kaiser's pre- and post-

LBO solvency, putting Kaiser on notice of the facts essential to KSC's claims against Touche in January 1984, and that the "actual harm" KSC claims was inflicted as a result of Touche's conduct occurred on the date of the LBO. Thus, Touche maintains that, on the two prong test stated in *Pleasant,* Kaiser's cause of action against Touche accrued on February 29, 1984, and KSC's action, filed in August 1990, is barred.

The issue, as KSC correctly points out, is not whether Kaiser's claims were time barred as of August 1990, but whether they were barred at the time Kaiser filed its bankruptcy petition on February 11, 1987.[16] KSC Resp. in Opp'n Mot.Summ.J. at 2. KSC asserts that under California's discovery rule, its negligence claim did not accrue until "well after" February 11, 1985, and that therefore its claims were still timely two years later on February 11, 1987, when the bankruptcy petition was filed. *Id.*

The essential fact on which KSC's claims against Touche turns is the inaccuracy of Touche's pre-LBO conclusion that Kaiser was solvent and that it would remain solvent after the LBO. Touche maintains that this fact was actually known by Kaiser and that, in any event, knowledge of it was attributed to Kaiser as a matter of law. Br.Supp.Def.'s Mot.Summ.J. at 10 (citing *Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 11 Cal.Rptr.2d 51, 68, 834 P.2d 745, 762 (1992)).

I find the question of when Kaiser discovered, or should have discovered, the truth about its financial condition is inherently factual.[17] Touche points to various interrogato-

---

**15.** Touche acknowledges that *Pleasant* involved legal malpractice, governed by § 340.6 of the Code, rather than professional malpractice, governed by § 339(1) and applicable here. Touche maintains that legal malpractice discovery principles apply to claims against other professionals, relying on *Neel v. Magana, Olney, Levy, Cathcart & Gelfand,* 6 Cal.3d 176, 98 Cal.Rptr. 837, 838, 491 P.2d 421, 422 (1971) (holding that "the statute of limitations for legal malpractice, as for all professional malpractice should not be tolled until the client discovers, or should discover, his cause of action"). *Neel,* however, concerned the interpretation of § 339, rather than § 340.6 which was added at a later date and deals exclusively with the statute of limitations for legal malpractice.

**16.** Once a bankruptcy petition is filed, § 108 of the Bankruptcy Code supersedes state statutes of limitations, and permits a trustee (or debtor-in-possession) a two-year extension of time in which to file any action on behalf of the debtor that is not time barred as of the date of the petition. 11 U.S.C. § 108(a).

**17.** The dicta Touche quotes from the *Bily* opinion does not compel a different conclusion. In *Bily,* the California Supreme Court held that an accountant's liability under general negligence principles is confined to its client, ruling that third-party investors could only recover against a CPA for negligent misrepresentation. 11 Cal. Rptr.2d at 68–70, 834 P.2d at 762–64 (essentially adopting the principles of limited liability set

ry responses and the fact that six actions were filed before the LBO challenging Kaiser's solvency and the accuracy of its financial statements as evidence that Kaiser "knew" the facts essential to its claims against Touche. Br.Supp.Def.'s Mot. Summ.J. at 13–14. KSC counters that it did not know, pointing to expert testimony and written opinions provided by Touche before, during, and after the LBO stating Kaiser was solvent. Resp. in Opp.Mot.Summ.J. at 3–4. KSC maintains that it was not until the fall of 1985, when Touche first acknowledged that Kaiser might be insolvent, that Kaiser had notice that Touche had misreported the company's financial condition. *Id.*

▪ Summary judgment on the question of whether a plaintiff's negligence claims are time barred under the California discovery rule is proper only where the uncontradicted facts established through discovery are "susceptible of only one legitimate inference." *See Jolly,* 245 Cal.Rptr. at 662, 751 P.2d at 928. The factual questions presented by Touche's motion for summary judgment are disputed and do not lend themselves to "one legitimate inference." Touche's motion for summary judgment is therefore denied.

### D. Touche Ross's Motion for Summary Judgment (Damages)

In this motion, Touche seeks summary judgment on KSC's malpractice claims on the grounds that KSC is unwilling or unable to produce post-LBO evidence at trial regarding damages and proximate causation of injury.

KSC has asserted five separate claims against Touche: breach of fiduciary duty, constructive fraud, negligence, breach of contract and negligent misrepresentation. As damages for each claim, KSC seeks the $218 million in cash paid out during the LBO. In its motion, Touche asserts that all the claims are essentially for professional malpractice, and that all require proof of actual injury proximately caused by *Touche.* KSC does not challenge this grouping. The essential

elements of a professional malpractice claim under California law include proof by the plaintiff as to what injury was suffered, i.e., damages, and that the alleged misconduct proximately caused the injury. *Budd v. Nixen,* 6 Cal.3d 195, 98 Cal.Rptr. 849, 852, 491 P.2d 433, 436 (1971).

Touche argues that KSC cannot establish the element of damages necessary to prove its claims. Touche asserts that any damages Kaiser suffered were a result of its bankruptcy. Therefore, Touche maintains that to determine the amount of damages caused by the LBO (if any), the cash and benefits that flowed to Kaiser as a result of the LBO must be examined as well as the $218 million in cash paid out. Further, Touche argues, in order to determine if the LBO was the proximate cause of Kaiser's insolvency, post-LBO events must be considered to see if other factors may have been a cause. Touche therefore asserts that KSC must prove the outcome of the LBO as part of its case in chief.

KSC counters that its damages theory is not that Touche's actions caused Kaiser's bankruptcy. Instead, KSC asserts that Touche's actions caused the ill-fated LBO to go forward and that its damages are "the outflow of monies in connection with the LBO." KSC Resp.Opp.Mot.Summ.J.Def. Touche (Damages) at 1. KSC claims that because of the cash outflows recommended by Touche, Kaiser was unable to fund pension and medical benefits plans adequately for its workers and that post-LBO events are irrelevant to its case.

▪ Touche maintains that KSC's "cash outflow" measure of damages is an attempt to recover in tort that which it cannot recover under a fraudulent conveyance theory because Touche was not the recipient of the conveyance, citing *In re Ampat Southern Corp.,* 128 B.R. 405, 411 (Bankr.D.Md.1991). In *Ampat,* a bankruptcy trustee brought fraudulent conveyance and breach of fiducia-

forth in Restatement (Second) Torts § 552A). The court reasoned that, *with respect to third parties,* the client bears greater responsibility for mistakes in an audit than does the auditor, be-

cause it is the client who necessarily furnishes the information base for the audit. *Id.* 11 Cal. Rptr.2d at 68, 834 P.2d at 762.

ry duty claims against a former officer and director of a corporation. The trustee sought damages for an alleged breach of duty which equalled the sum of two alleged fraudulent conveyances. The court held that the trustee could not recover on its fraudulent conveyance claims because the director was a non-beneficiary to the allegedly fraudulent transfer. *Id.* The court further held that the trustee could not recover in tort the same amount allegedly fraudulently transferred, simply by calling it damages for breach of fiduciary duty. *Id. See also Elliott v. Glushon,* 390 F.2d 514, 517 (9th Cir. 1967). Neither *Ampat* nor *Elliott* precludes a tort action against a non-transferee, however, where a plaintiff is able to prove the essential elements of its claim in tort. Thus, if KSC can establish the necessary elements of its tort claims against Touche, it may recover the $218 million LBO cash-outflow despite the fact that it could not sustain a fraudulent conveyance claim against Touche.

 Touche argues that, to establish causation and damages, KSC must introduce evidence of post-LBO events. Touche asserts that the deposition testimony of KSC's expert reflects that he will not testify as to post-LBO events and therefore, KSC cannot prove its damages. KSC responds that the damages of which it complains were the expenses and debt incurred in connection with the LBO and that expert testimony is not required to make a submissible case on damages. *See McGinn v. Merrill Lynch, Pierce, Fenner & Smith,* 736 F.2d 1254, 1257 (8th Cir.1984).

KSC argues that it seeks damages resulting from Kaiser's reliance on Touche's allegedly negligent advice regarding the LBO. KSC seeks to be returned to the economic position it occupied before it acted in reliance on such advice. Such damages "enable the innocent party to recover identifiable costs incurred in reliance on the breaching party's promise, where the breaching party could reasonably foresee that they would be incurred." *McKinley Allsopp, Inc. v. Jetborne Int'l, Inc.,* 1990 WL 138959 (S.D.N.Y., Sept. 19, 1990).

"The question of whether defendant's negligence was the legal cause of plaintiff's injury, i.e., whether plaintiff has sustained the burden of establishing that defendant's negligence was the cause in fact from which his injury proximately resulted, is ordinarily for the trier of facts." *Basin Oil Co. of California v. Baash–Ross Tool Co.,* 125 Cal.App.2d 578, 271 P.2d 122, 137 (1954). "The amount of damages to be awarded in a particular case is ordinarily a question of fact, entirely within the province of the jury." *Mendoza v. Rudolf,* 140 Cal.App.2d 633, 295 P.2d 445, 448 (1956).

Touche has not shown, as a matter of law, that it is entitled to judgment on the issues of causation and damages. Triable issues of fact exist as to the damages which Kaiser suffered and the cause of such damages. Factual inferences which may be drawn from discovery to date are inconclusive. The answers to the questions of causation and damages must, therefore, await trial. I therefore deny Touche's motion for summary judgment.

Based on the foregoing, it is ORDERED that the several motions for summary judgment are denied except for that of the First Boston Corporation on KSC's claims for breach of fiduciary duty and constructive fraud, which is granted for the reasons stated in this opinion.